# UNITED STATES *v.* CACERES

No. 76-1309.   Argued January 8, 9, 1979—Decided April 2, 1979

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 757.

*Kenneth S. Geller* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Heymann,* and *Jerome M. Feit.*

*James J. Brosnahan* argued the cause for respondent. With him on the brief was *H. Preston Moore, Jr.*

MR. JUSTICE STEVENS delivered the opinion of the Court.

The question we granted certiorari to decide is whether evidence obtained in violation of Internal Revenue Service (IRS) regulations may be admitted at the criminal trial of a taxpayer accused of bribing an IRS agent. 436 U. S. 943 (1978).

Unbeknown to respondent, three of his face-to-face conversations with IRS Agent Yee were monitored by means of a radio transmitter concealed on Yee's person. Respondent moved to suppress tape recordings of the three conversations on the ground that the authorizations required by IRS regulations had not been secured. The District Court granted the motion. The Court of Appeals for the Ninth Circuit reversed as to the third tape; it concluded that adequate authorization had been obtained.[1] As to the first two tapes, however, the Court of Appeals agreed with the District Court both that the IRS regulations had not been followed and that exclusion of the recordings was therefore required. It is the latter conclusion that is at issue here.

The Government argues that exclusion of probative evidence in a criminal trial is an inappropriate sanction for violation of an executive department's regulations. In this case, moreover, it argues that suppression is especially inappropriate because the violation of the regulation was neither deliberate nor prejudicial, and did not affect any constitu-

---

[1] 545 F. 2d 1182 (1976). The District Court suppressed evidence relating to the third conversation as well on the ground that the approval of a *Deputy* Assistant Attorney General was not sufficient to comply with the regulations. The Court of Appeals disagreed, concluding that the Attorney General's authority to approve such monitoring could be delegated not only to Assistant Attorneys General, as provided specifically in the regulation, but also to their deputies. That conclusion is not at issue here.

tional or statutory rights. We agree that suppression should not have been ordered in this case, and therefore reverse the judgment of the Court of Appeals.

## I

Neither the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants.[2] Such "consensual electronic surveillance" between taxpayers and IRS agents is, however, prohibited by IRS regulations unless appropriate prior authorization is obtained.[3]

The IRS Manual sets forth in detail the procedures to be followed in obtaining such approvals.[4] For all types of re-

---

[2] See *United States* v. *White,* 401 U. S. 745, 752 (plurality opinion); *Lopez* v. *United States,* 373 U. S. 427; 18 U. S. C. § 2511 (2)(c); *infra,* at 749-751.

[3] The IRS regulations were drafted to conform to the requirements of the Attorney General's October 16, 1972, Memorandum to the Heads of Executive Departments and Agencies. The memorandum mandates Justice Department approval for all consensual monitoring of nontelephone conversations by federal departments and agencies. The only exceptions are if less than 48 hours is available to secure approval or if exigent circumstances preclude requests for advance authorization from the Justice Department; in such cases, monitoring may be instituted under the authorization of the head of the department or agency, or other officials designated by him.

[4] Paragraph 652.22 of the IRS Manual (in effect Sept. 1975) provides in pertinent part:

"(1) The monitoring of non-telephone conversations with the consent of one party requires the advance authorization of the Attorney General or any designated Assistant Attorney General. Requests for such authority may be signed by the Director, Internal Security Division, or, in his/her absence, the Acting Director. This authority cannot be redelegated. These same officials may authorize temporary emergency monitoring when exigent circumstances preclude requesting the authorization of the Attorney General in advance. If the Director, Internal Security Division,

quests the regulations require an explanation of the reasons for the proposal, the type of equipment to be used, the names of the persons involved, and the duration of the proposed monitoring.

Approval by as many as three different levels of authority may be required, depending on the kind of surveillance that is contemplated and the circumstances of the request. Telephone conversations may be monitored with the approval of an Assistant Regional Inspector of the Internal Security Division. Such advance approval may be requested and given verbally, although the authorization must subsequently be

---

cannot be reached, the Assistant Commissioner (Inspection) may grant emergency approval. This authority cannot be redelegated.

"(2) Written approval of the Attorney General must be requested 48 hours prior to the use of mechanical, electronic or other devices to overhear, transmit or record a non-telephone private conversation with the permission of one party to the conversation. . . . Any requests being telefaxed into the National Office should be submitted four days prior to the anticipated equipment use. . . .

"(3) [A request] must be signed and submitted by the Regional Inspector or Chief, Investigations Branch, to the Director, Internal Security Division. Such requests will contain [reason for such proposed use; type of equipment to be used; names of persons involved; proposed location of equipment; duration of proposed use (limited to 30 days from proposed beginning date); and manner or method of installation] . . . .

.          .          .          .          .

"(6) When emergency situations occur, the Director or Acting Director, Internal Security Division, or the Assistant Commissioner (Inspection) will be contacted to grant emergency approval to monitor. This emergency approval authority cannot be redelegated. . . . Emergency authorization pursuant to this exception will not be given where the requesting official has in excess of 48 hours to obtain written advance approval from the Attorney General.

"(7) If, at the time the emergency approval request is submitted, it is desired that approval for use of electronic equipment be given for an extended period, this should be indicated on the [appropriate form]. The Director, in addition to reporting his authorization for emergency use to the Attorney General, will also request approval for the Use of Electronic Equipment for the duration of that period specified by the requestor."

confirmed in writing. The monitoring of nontelephone conversations requires approval at the national as well as the regional level. In emergency situations, the Director, or Acting Director, Internal Security Division, or the Assistant Commissioner (Inspection) may authorize the recording. If there is at least 48 hours in which to obtain approval, a signed request must also be submitted to the Attorney General of the United States, or a designated Assistant Attorney General, by the Director or Acting Director of the Internal Security Division.

## II

On March 14, 1974, Agent Yee met with respondent and his wife in connection with an audit of their 1971 income tax returns. After Mrs. Caceres left the meeting, respondent offered Yee a "personal settlement" of $500 in exchange for a favorable resolution of the audit. When he returned to the IRS office, Yee reported the offer to his superiors and prepared an affidavit describing it.[5]

The record reflects no further discussion of the offer until January 1975. It does indicate, however, that one telephone conversation between Yee and respondent, on March 21, 1974, was recorded with authorization,[6] and that authority was also obtained to monitor face-to-face conversations with respondent from time to time during the period between March and September 1974.[7] Yee continued to work on the

---

[5] App. 20, 23–24, 46.

[6] Id., at 25–27, 46.

[7] Requests for authorization to use electronic equipment to monitor nontelephone conversations are made on a form (No. 5177) that requires disclosure of the dates of previous authorizations. The form dated January 31, 1975, App. 63, is termed an extension, and reports prior authorizations dated March 25, April 24, May 24, June 27, July 23, and August 29, 1974. Under the regulations, a single authorization may cover a period of up to 30 days; the intervals between the dates of prior authorizations in this case are consistent with successive 30-day authorizations, although this has not been established by any evidence called to our attention.

audit of respondent's records throughout this period, but his meetings, until January 1975, were with Mrs. Caceres and the Cacereses' accountant.[8]

On January 27, 1975, Yee had a meeting with respondent that was not recorded. According to Yee's affidavit,[9] the meeting proceeded in two stages. First, he discussed his calculations with respondent, Mrs. Caceres, and their accountant. When respondent and his wife asked for an additional week to check their records, Yee told them it would be necessary to sign an extension because the statute of limitations would otherwise expire soon. Respondent stated that he would have to consult his attorney before signing any extension, and would call Yee with his decision later that day.

Yee then left the office to return to his car. He was followed by respondent, who revived the subject of a "personal settlement." This time, respondent indicated that he had $500 that he would give Yee immediately, with an additional $500 to be paid when the matter was finally settled. Yee refused the offer, but at respondent's insistence, eventually stated that he might consider it.

In subsequent conversations initiated by Agent Yee, all of which were monitored,[10] respondent indicated that he was not prepared for another meeting with Yee. Finally, in a conversation on January 30 at 5:15 p. m., respondent agreed to a meeting the following day at 2 p. m. At 8:15 a. m. on the

---

[8] Yee had one follow-up conversation with respondent later in March, which was not monitored. From that point until January 1975, he had no further contact with respondent. App. to Pet. for Cert. 16a (opinion and order of the District Court); App. 21–22.

[9] *Id.*, at 65–67.

[10] In the District Court, respondent moved to suppress evidence relating to these telephone conversations on the grounds that the monitoring had not been properly authorized. The District Court rejected that challenge, concluding that the applicable IRS regulations had been followed with respect to these conversations. App. to Pet. for Cert. 16a–17a. That ruling is not at issue here.

31st, the Regional Inspector in San Francisco telephoned the Director of Internal Security in Washington and obtained emergency approval for the use of electronic equipment to monitor the meeting that afternoon. On the same day, a written request for authority to monitor face-to-face conversations for a period of 30 days was initiated and, in due course, forwarded to Washington for submission to the Department of Justice.

At the meeting on the 31st, respondent gave Yee $500 and promised to give him an additional $500 when he received a notice from IRS showing his deficiency at an amount upon which he and Yee had agreed. As in all his future meetings with respondent, Yee wore a concealed radio transmitter which allowed other agents to monitor and record their conversation.

Yee next called respondent on February 5 and arranged a meeting for the next day to review the audit agreement. Because the Department of Justice had not yet acted on, or perhaps even received, the request for a 30-day authorization, the Regional Inspector again requested and obtained emergency approval to monitor the meeting with respondent. At the February 6 meeting, respondent renewed his promise to pay an additional $500 in connection with the 1971 return, and also offered Yee another $2,000 for help in settling his 1973 and 1974 returns.

On February 11, a Deputy Assistant Attorney General approved the request for authority to monitor Yee's conversations with respondent for 30 days. The approval was received in time to cover a meeting held that day at which Yee was paid the additional $500. Because the 30-day period did not commence until February 11, however, no approval from the Department of Justice was ever obtained for the earlier monitorings of January 31 and February 6.

The District Court and the Court of Appeals both held that the two earlier meetings had not been monitored in accordance with IRS regulations, since Justice Department approval had

not been secured. The courts recognized that such approval is not required, by the terms of the regulations, in "emergency situations" when less than 48 hours is available to secure authorization. They recognized, too, that in each instance, less than 48 hours did exist between the time the IRS initiated its request for monitoring approval and the time of the scheduled meeting with Yee. But the courts concluded that neither meeting fell within the emergency provision of the regulations because the exigencies were the product of "government-created scheduling problems." [11]

The Government does not challenge that conclusion. We are therefore presented with the question whether the tape recordings, and the testimony of the agents who monitored the January 31 and February 6 conversations, should be excluded because of the violation of the IRS regulations.

## III

A court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law. In *Bridges* v. *Wixon*, 326 U. S. 135, 152–153, for example, this Court held invalid a deportation ordered on the basis of statements which did not comply with the Immigration Service's rules requiring signatures and oaths, finding that the rules were designed "to afford [the alien] due process of law" by providing "safeguards against essentially unfair procedures." [12]

In this case, however, unlike *Bridges* v. *Wixon*, the agency was not required by the Constitution or by statute to adopt any particular procedures or rules before engaging in con-

---

[11] 545 F. 2d, at 1187. See also App. to Pet. for Cert. 20a (opinion of District Court) ("the only 'emergency' was created wholly by the I. R. S.").

[12] See also *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S. 149, 155 (Court assumed that "one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law").

sensual monitoring and recording. While Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. § 2510 *et seq.,* regulates electronic surveillance conducted without the consent of either party to a conversation, federal statutes impose no restrictions on recording a conversation with the consent of one of the conversants.

Nor does the Constitution protect the privacy of individuals in respondent's position. In *Lopez* v. *United States,* 373 U. S. 427, 439, we held that the Fourth Amendment provided no protection to an individual against the recording of his statements by the IRS agent to whom he was speaking. In doing so, we repudiated any suggestion that the defendant had a "constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment," concluding instead that "the risk that petitioner took in offering a bribe to [the IRS agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." The same analysis was applied in *United States* v. *White,* 401 U. S. 745, to consensual monitoring and recording by means of a transmitter concealed on an informant's person, even though the defendant did not know that he was speaking with a Government agent:

"Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa* v. *United States,* 385 U. S., at 300–303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person,

*Lopez* v. *United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee* v. *United States,* [343 U. S. 747]. If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *United States* v. *White, supra,* at 751 (opinion of WHITE, J.).[13]

Our decisions in *Lopez* and *White* demonstrate that the IRS was not required by the Constitution to adopt these regulations.[14] It is equally clear that the violations of agency regu-

[13] MR. JUSTICE WHITE further stated:

"Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat or injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question." 401 U. S., at 753.

[14] It does not necessarily follow, however, as a matter of either logic or law, that the agency had no duty to obey them. "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton* v. *Ruiz,* 415 U. S. 199, 235. See, *e. g., United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S. 260 (holding habeas corpus relief proper where Government regulations "with the force and effect of law" governing the procedure to be followed in processing and passing upon an alien's application for suspen-

lations disclosed by this record do not raise any constitutional questions.

It is true, of course, that respondent's conversations were monitored without the approval of the Department of Justice, whereas the conversations of others in a similar position would, assuming the IRS generally follows its regulations, be recorded only with Justice Department approval. But this difference does not even arguably amount to a denial of equal protection. No claim is, or reasonably could be, made that if the IRS had more promptly addressed this request to the Department of Justice, it would have been denied. As a result, any inconsistency of which respondent might complain is purely one of form, with no discernible effect in this case on the action taken by the agency and its treatment of respondent.

Moreover, the failure to secure Justice Department authorization, while conceded here to be a violation of the IRS regulations, was attributable to the fact that the IRS officials responsible for administration of the relevant regulations, both in San Francisco and Washington, construed the situation as an emergency within the meaning of those regulations. Their construction of their own regulations, even if erroneous, was not obviously so. That kind of error by an executive agency in interpreting its own regulations surely does not raise any constitutional questions.

Nor is this a case in which the Due Process Clause is implicated because an individual has reasonably relied on agency

---

sion of deportation were not followed); *Service* v. *Dulles,* 354 U. S. 363 (invalidating Secretary of State's dismissal of an employee where regulations requiring approval of the Deputy Undersecretary and consultation of full record were not satisfied); *Vitarelli* v. *Seaton,* 359 U. S. 535 (invalidating dismissal of Interior Department employee where regulations governing hearing procedures for national security dismissals were not followed). See also *Yellin* v. *United States,* 374 U. S. 109 (reversing contempt conviction where congressional committee had not complied with its rules requiring it to consider a witness' request to be heard in executive session).

regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency.[15] Respondent cannot reasonably contend that he relied on the regulation, or that its breach had any effect on his conduct. He did not know that his conversations with Yee were being recorded without proper authority. He was, of course, prejudiced in the sense that he would be better off if all monitoring had been postponed until after the Deputy Assistant Attorney General's approval was obtained on February 11, 1975, but precisely the same prejudice would have ensued if the approval had been issued more promptly. For the record makes it perfectly clear that a delay in processing the request, rather than any doubt about its propriety or sufficiency, was the sole reason why advance authorization was not obtained before February 11.

Finally, the Administrative Procedure Act[16] provides no grounds for judicial enforcement of the regulation violated in this case. The APA authorizes judicial review and invalidation of agency action that is arbitrary, capricious, an abuse of discretion, or not in accordance with law, as well as action

---

[15] In *Raley* v. *Ohio,* 360 U. S. 423, 437–438, we held that due process precluded the conviction of individuals for refusing to answer questions asked by a state investigating commission which itself had erroneously provided assurances, express or implied, that the defendants had a privilege under state law to refuse to answer. And in *Cox* v. *Louisiana,* 379 U. S. 559, the Court held that an individual could not be punished for demonstrating "near" a courthouse where the highest police officials of the city had advised the demonstrators that they could meet where they did without violating the statutory proscription against demonstrations "near" the courthouse. Cf. *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.,* 284 U. S. 370 (holding invalid Interstate Commerce Commission's retroactive application of new rate); *Columbia Broadcasting System, Inc.* v. *United States,* 316 U. S. 407, 422 (agency regulations on which individuals are "entitled to rely" bind agency and are therefore ripe for judicial review). The underlying rationale of the foregoing cases is plainly inapplicable here.

[16] The Act was originally passed in 1946, 60 Stat. 237, and is codified at 5 U. S. C. § 551 *et seq.* and § 701 *et seq.*

taken "without observance of procedure required by law." [17] Agency violations of their own regulations, whether or not also in violation of the Constitution, may well be inconsistent with the standards of agency action which the APA directs the courts to enforce.[18] Indeed, some of our most important decisions holding agencies bound by their regulations have been in cases originally brought under the APA.[19]

But this is not an APA case, and the remedy sought is not invalidation of the agency action. Rather, we are dealing with a criminal prosecution in which respondent seeks judicial enforcement of the agency regulations by means of the exclusionary rule. That rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial.[20] In view of our

---

[17] 5 U. S. C. § 706.

[18] Cf. *Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U. S. 78, 92 n. 8; *Vitarelli* v. *Seaton, supra,* at 547 (Frankfurter, J., concurring in part and dissenting in part) ("This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so. He that takes the procedural sword shall perish with that sword").

Even as a matter of administrative law, however, it seems clear that agencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as "internal." In *American Farm Lines* v. *Black Ball Freight Service,* 397 U. S. 532, 538, for example, ICC rules requiring certain information to be included in applications had not been followed. This Court rejected the argument that the agency action was therefore invalid, concluding that the Commission was "entitled to a measure of discretion in administering its own procedural rules in such a manner as it deems necessary to resolve quickly and correctly urgent transportation problems."

[19] See App. in *Service* v. *Dulles,* O. T. 1956, No. 407, p. 40; App. in *Vitarelli* v. *Seaton,* O. T. 1958, No. 101, p. 7. The complaints in both of these cases invoked 5 U. S. C. § 1009 (1964 ed.), the then-applicable APA judicial-review provision.

[20] See *Linkletter* v. *Walker,* 381 U. S. 618, 633, 636–637; *Mapp* v. *Ohio,* 367 U. S. 643, 656; *Elkins* v. *United States,* 364 U. S. 206, 217.

conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.[21]

## IV

Respondent argues that the regulations concerning electronic eavesdropping, even though not required by the Constitution or by statute, are of such importance in safeguarding the privacy of the citizenry that a rigid exclusionary rule should be applied to all evidence obtained in violation of any of their provisions. We do not doubt the importance of these rules. Nevertheless, without pausing to evaluate the Government's challenge to our power to do so,[22] we decline to adopt any rigid rule requiring federal courts to exclude any evidence obtained as a result of a violation of these rules.

Regulations governing the conduct of criminal investigations are generally considered desirable, and may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence in criminal trials.[23] Although we do not suggest that a suppression order in this case would cause the IRS to abandon or modify its electronic surveillance regulations, we cannot ignore the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious

---

[21] Since no statute was violated by the recording of respondent's conversations, this Court's decision in *Miller* v. *United States,* 357 U. S. 301, is likewise inapplicable.

[22] The Government argues that Fed. Rule Evid. 402 and 18 U. S. C. § 3501 prohibited the Court of Appeals from exercising whatever supervisory power it might otherwise have to suppress evidence of respondent's statements to Yee. Brief for United States 42.

[23] See Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 416–428 (1974); McGowan, Rule-Making and the Police, 70 Mich. L. Rev. 659 (1972).

deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures.[24] Here, the Executive itself has provided for internal sanctions in cases of knowing violations of the electronic-surveillance regulations.[25] To go beyond that, and require exclusion in every case, would take away from the Executive Department the primary responsibility for fashioning the appropriate remedy for the violation of its regulations. But since the content, and indeed the existence, of the regulations would remain within the Executive's sole authority, the result might well be fewer and less protective regulations. In the long run, it is far better to have rules like those contained in the IRS Manual, and to tolerate occasional erroneous administration of the kind displayed by this record, than either to have no rules except those mandated by statute, or to have them framed in a mere precatory form.

Nor can we accept respondent's further argument that even without a rigid rule of exclusion, his is a case in which evidence secured in violation of the agency regulation should be excluded on the basis of a more limited, individualized approach. Quite the contrary, this case exemplifies those situations in which evidence would *not* be excluded if a case-by-case approach were applied. The two conversations at issue here were recorded with the approval of the IRS officials in San Francisco and Washington. In an emergency situa-

---

[24] See F. Cooper, Administrative Agencies and the Courts 289–290 (1951) ("[T]oo rigid an application of the doctrine prohibiting disregard of procedural rules would encourage the tendency of some agencies to proceed almost without rules. The doctrine should not be pressed so far as to induce agencies to adopt the protective device of promulgating procedural rules so vague in nature as to make it impossible to show a violation of the rules").

[25] See IRS Manual ¶ 652.1 (3) (in effect Sept. 1975) ("Any employee who knowingly violates or in any way knowingly countenances violation of this policy will be subject to disciplinary action and may be removed from the Service").

tion, which the agents thought was present, this approval would have been sufficient. The agency action, while later found to be in violation of the regulations, nonetheless reflected a reasonable, good-faith attempt to comply in a situation in which no one questions that monitoring was appropriate and would have certainly received Justice Department authorization, had the request been received more promptly. In these circumstances, there is simply no reason why a court should exercise whatever discretion it may have to exclude evidence obtained in violation of the regulations.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court today holds that evidence obtained in patent violation of agency procedures is admissible in a criminal prosecution. In so ruling, the majority determines both that the Internal Revenue Service's failure to comply with its own mandatory regulations implicates no due process interest, and that the exclusionary rule is an inappropriate sanction for such noncompliance. Because I can subscribe to neither proposition, and because the Court's decision must inevitably erode respect for law among those charged with its administration, I respectfully dissent.

I

In a long line of cases beginning with *Bridges* v. *Wixon,* 326 U. S. 135, 152–153 (1945), this Court has held that "one under investigation ... is legally entitled to insist upon the observance of rules" promulgated by an executive or legislative body for his protection. See *United States* v. *Nixon,* 418 U. S. 683, 695–696 (1974); *Morton* v. *Ruiz,* 415 U. S. 199, 235 (1974); *Yellin* v. *United States,* 374 U. S. 109 (1963); *Vitarelli* v. *Seaton,* 359 U. S. 535 (1959); *Service* v. *Dulles,* 354 U. S. 363 (1957); *United States ex rel. Accardi* v.

*Shaughnessy,* 347 U. S. 260 (1954). Underlying these decisions is a judgment, central to our concept of due process, that government officials no less than private citizens are bound by rules of law.[1] Where individual interests are implicated, the Due Process Clause requires that an executive agency adhere to the standards by which it professes its action to be judged. See *Vitarelli* v. *Seaton, supra,* at 547 (Frankfurter, J., concurring in part and dissenting in part).

Despite these well-established precedents and the IRS's conceded failure to abide by mandatory investigative regulations, the Court finds no due process violation on the facts of this case. In reaching its conclusion, the majority relies on the absence of constitutional or statutory underpinnings for

---

[1] Although not always expressly predicated on the Due Process Clause, these decisions are explicable in no other terms. The complaints in only two of the cases, *Vitarelli* v. *Seaton,* 359 U. S. 535 (1959), and *Service* v. *Dulles,* 354 U. S. 363 (1957), invoked the Administrative Procedure Act, see *ante,* at 754 n. 19. In neither of these cases was the Act even mentioned in the Court's opinions. Rather, *Vitarelli* followed *Service,* see 359 U. S., at 539–540, which in turn had relied on *United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S. 260 (1954). See 354 U. S., at 373, 386–387. Both *Accardi* and its predecessor, *Bridges* v. *Wixon,* 326 U. S. 135 (1945), were habeas corpus cases. And *Yellin* v. *United States,* 374 U. S. 109 (1963), which involved criminal contempt sanctions, followed *Accardi.* Thus, it is clear that this line of precedent cannot be dismissed as federal administrative law. Cf. *Board of Curators, Univ. of Mo.* v. *Horowitz,* 435 U. S. 78, 92 n. 8 (1978) (dictum). To the contrary, these decisions have been uniformly, and I believe properly, interpreted as resting on due process foundations. See *United States* v. *Sourapas,* 515 F. 2d 295, 298 (CA9 1975); *Konn* v. *Laird,* 460 F. 2d 1318 (CA7 1972); *Antonuk* v. *United States,* 445 F. 2d 592, 595 (CA6 1971); *Hollingsworth* v. *Balcom,* 441 F. 2d 419, 421 (CA6 1971); *United States* v. *Leahey,* 434 F. 2d 7, 9 (CA1 1970); *United States* v. *Lloyd,* 431 F. 2d 160, 171 (CA9 1970); *Government of Canal Zone* v. *Brooks,* 427 F. 2d 346, 347 (CA5 1970); *United States* v. *Heffner,* 420 F. 2d 809, 811–812 (CA4 1969); cf. *Schatten* v. *United States,* 419 F. 2d 187, 191 (CA6 1969). See generally Berger, Do Regulations Really Bind Regulators, 62 Nw. U. L. Rev. 137 (1967).

the regulations and on respondent's inability to establish prejudice from their circumvention. This approach draws support neither from our prior holdings nor from the principles on which the Due Process Clause is founded.

This Court has consistently demanded governmental compliance with regulations designed to safeguard individual interests even when the rules were not mandated by the Constitution or federal statute. In *United States ex rel. Accardi* v. *Shaughnessy, supra,* the Court granted a writ of habeas corpus where the Attorney General had disregarded applicable procedures for the Board of Immigration Appeals' suspension of deportation orders. Although the Attorney General had final power to deport the petitioner and had no statutory or constitutional obligation to provide for intermediate action by the Board, this Court held that while suspension procedures were in effect, "the Attorney General denies himself the right to sidestep the Board or dictate its decision." 347 U. S., at 267. On similar reasoning, the Court in *Service* v. *Dulles* vacated a Foreign Service officer's national security discharge. While acknowledging that the Secretary of State was not obligated to adopt "rigorous substantive and procedural safeguards," the Court nonetheless held that "having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them." 354 U. S., at 388. Similarly, in *Vitarelli* v. *Seaton* we demanded adherence to Department of the Interior employee-discharge procedures that were "generous beyond the requirements that bind [the] agency." 359 U. S., at 547 (Frankfurter, J., concurring in part and dissenting in part). And most recently, in *Morton* v. *Ruiz,* we declined to permit the Bureau of Indian Affairs to depart from internal rules for establishing assistance-eligibility requirements although the procedures were "more rigorous than otherwise would be required." 415 U. S., at 235. See also *United States* v. *Nixon, supra; Yellin* v. *United States, supra; Bridges* v.

*Wixon,* 326 U. S. 135 (1945).[2] Thus, where internal regulations do not merely facilitate internal agency housekeeping, cf. *American Farm Lines* v. *Black Ball Freight Service,* 397 U. S. 532, 538 (1970),[3] but rather afford significant procedural protections, we have insisted on compliance.

That the IRS regulations at issue here extend such protections is beyond dispute. As this Court recognized in *Berger* v. *New York,* 388 U. S. 41, 63 (1967), "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." An agency's self-imposed constraints on the use of these devices, no less than limitations mandated by statute or by the Fourth Amendment, operate to preserve a "measure of privacy and a sense of personal security" for individuals potentially subject to surveillance. See *United States* v. *White,* 401 U. S. 745, 790 (1971) (Harlan, J., dissenting).

Moreover, the history of the IRS authorization requirements clearly establishes that they were intended to protect privacy interests. The regulations were an outgrowth of investigations in 1965 and 1966 by a Subcommittee of the Senate Judiciary Committee concerning surveillance techniques of federal agencies. Testimony at Subcommittee hearings revealed that IRS agents had made extensive unauthorized use of a wide variety of eavesdropping techniques.

---

[2] At issue in *Bridges* were regulations requiring that witness statements be made under oath and signed in order to be admissible in deportation hearings. As the Court correctly points out, *ante,* at 749, those rules were designed as "safeguards against essentially unfair procedures." 326 U. S., at 153. However, there is no basis in precedent or in the language of *Bridges* itself for the majority's further intimation that the Due Process Clause "mandated" such protective regulations. *Ante,* at 749.

[3] *American Farm Lines* v. *Black Ball Freight Service* involved rules promulgated to assist an agency in compiling information for internal decisionmaking. As the *American Farm* Court noted in distinguishing *Vitarelli* v. *Seaton, supra,* these rules were not "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion . . . ." 397 U. S., at 538–539.

Hearings on S. Res. 39 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st and 2d Sess., 1206–1208, 1762–1763, 1774–1777, 1828–1830, 1923–1935, 1999–2003 (1965–1966) (hereinafter S. Res. 39 Hearings).[4]   Among the agency practices that the Subcommittee found offensive was the monitoring of certain conversations between taxpayers and IRS agents wired for sound.   See, *e. g., id.,* at 2017, 2078. Of more general concern was the agency's total failure to detect or disapprove violations of its own internal rules. Evidence before the Subcommittee indicated that supervisory personnel had condoned the use of illegal wiretaps, see *id.,* 1517, 1546–1548, while upper level officials had remained ignorant of widespread departures from prescribed policies. See *id.,* 1118, 1124–1128, 2005.

In response to that congressional investigation, the IRS convened a special Board of Inquiry to review agency surveillance practices and to recommend new procedures.   Both the scope of the new regulations and the IRS Commissioner's representations to the Senate Subcommittee demonstrate that the agency was concerned not only with preventing "violation[s] of a person's constitutional or statutory rights," but also with "carefully control[ling]" certain investigatory techniques which, "although legal, nevertheless tend to be offensive to the public conscience."   *Id.,* at 1122 (testimony of Commissioner Cohen).   The Commissioner further assured the Subcommittee that detailed regulations adopted by the agency in 1967 would guarantee such control.   *Id.,* at 1122–1126; CCH [1967] Stand. Fed. Tax Rep. ¶ 6711, p. 71,756.   Those regulations, recodified without substantial modification, are

---

[4] As summarized by Senator Morse: "The record reveals that illegal wiretapping by the Internal Revenue Service is not an occasional action of an overzealous agent, but is the logical and reasonable consequence of a well-defined program . . . ."   Hearings on S. Res. 928 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 29 (1967).

the basis of the instant proceedings. Compare Internal Revenue Service Manual ¶ 652.22 (Sept. 1975) with Internal Revenue Service Manual Supplement, Wiretapping and Electronic Eavesdropping, No. 93G–70 (July 10, 1967).

Against this historical backdrop, it is inarguable that these IRS regulations affect substantial individual interests. Indeed the Court does not suggest otherwise. Rather, it places weight on respondent's failure to establish prejudice from agency illegality. Because Caceres cannot demonstrate that he "reasonably relied" on the regulations, *ante*, at 752, or that the failure to obtain proper authorization had any "discernible effect" on the IRS's decision to monitor his conversations with Agent Yee, *ibid.*, the Court concludes that the agency's action implicates no due process interest. Such an approach is fundamentally misconceived. By assessing respondent's claim in terms of prejudice, the Court disregards not only its prior holdings, but also the principles of governmental regularity on which they rest.

To make subjective reliance controlling in due process analysis deflects inquiry from the relevant constitutional issue, the legitimacy of government conduct. If an individual is entitled only to the process that he subjectively believes is due, an agency could disregard its investigative rules with impunity provided it did so with consistency. For no person could "reasonably rely," *ibid.*, on rules that were generally ignored. And to the extent that the majority views reliance as critical in an investigative context, it effectively reduces mandatory regulations to hortatory policies. Presumably the only persons with occasion to discover breaches of investigative rules will be those facing criminal prosecution. Such individuals will rarely, if ever, be able to establish that they planned their conduct with internal agency regulations in view.[5]

---

[5] Just as we do not expect defendants in Fourth Amendment cases to demonstrate that but for the warrant requirement they would have acted

Moreover, the Court's focus on subjective reliance is inconsistent with our prior decisions enforcing due process guarantees. In *Bridges* v. *Wixon,* 326 U. S. 135 (1945), we vacated a deportation order because the Immigration and Naturalization Service had failed to observe regulations requiring that witness statements be made under oath, even though the petitioner's statements were not involved and he had not invoked the regulations at his deportation hearing. So too, in *Yellin* v. *United States,* 374 U. S. 109 (1963), this Court overturned the defendant's contempt conviction for refusal to testify before Congress where the House Committee on Un-American Activities had ignored rules requiring it to consider formally the injuries to a witness' reputation that might attend public hearings. Yet as the dissent in *Yellin* pointed out, the defendant had predicated his refusal to testify on First Amendment grounds, not on the public nature of the proceedings, and had in "no way indicated that an executive session would have made any difference in his willingness to answer questions." *Id.,* at 141 (WHITE, J., dissenting).

Nor has this Court required, as it does today, that procedural irregularity affect the outcome of the governmental action at issue. For example, there was no suggestion in *Yellin* that, had the Committee formally considered the injury to the defendant's reputation, it would have convened an executive session. Indeed, the Committee Chairman had testified that this was precisely the kind of case where a public hearing was appropriate. *Id.,* at 117–118, n. 6. Nonetheless, the Court, even as it expressed doubt that procedural com-

---

otherwise, we should not demand that those in respondent's position establish that they predicated their action on the existence of internal regulations. In both contexts, the rationale for mandating government compliance with procedural safeguards is the same: to prevent law enforcement officials from exercising unchecked discretion where substantial privacy interests are involved. And in neither case is a requirement of subjective reliance consistent with that objective.

pliance would have made a difference, insisted that the defendant was entitled to no less. *Id.*, at 121.[6]

Similarly, the petitioner in *Vitarelli* v. *Seaton,* 359 U. S. 535 (1959), was in no meaningful sense prejudiced by the Department of the Interior's departure from regulations governing employee discharges for national security reasons. After the petitioner filed suit, he received a revised notice of dismissal which complied with all applicable regulations. Despite the petitioner's inability to demonstrate that adherence to agency regulations would have affected the decision to discharge him, this Court ordered reinstatement.

Implicit in these decisions,[7] and in the Due Process Clause itself, is the premise that regulations bind with equal force whether or not they are outcome determinative. As its very terms make manifest, the Due Process Clause is first and foremost a guarantor of *process.* It embodies a commitment to procedural regularity independent of result. To focus on the conduct of individual defendants rather than on that of the government necessarily qualifies this commitment. If prejudice becomes critical in measuring due process obligations, individual officials may simply dispense with whatever procedures are unlikely to prove dispositive in a given case. Thus, the majority's analysis invites the very kind of capricious and unfettered decisionmaking that the Due Process Clause in general and these regulations in particular were designed to prevent.

---

[6] The *Yellin* Court, 374 U. S., at 121, was equally dubious that agency adherence to its regulations would have affected the Attorney General's ultimate decision to deport in *United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S., at 267.

[7] In part, these decisions also reflect a prudent reluctance to speculate how another branch of government would have acted under different circumstances. Because the Court has so little apparent difficulty in hypothesizing that compliance would not have mattered in this case, see *ante,* at 752–753, 757, it has adopted an approach that may well prove problematic in the next. Not all circumstances affecting agency decisions will so readily lend themselves to counterfactual analysis.

Any fair application of our prior holdings mandates a different result. When the Government engages to protect individual interests, it may not constitutionally abrogate that commitment at its own convenience. I would hold the IRS to its surveillance-authorization procedures regardless of whether a litigant can establish prejudice from their circumvention.

## II

Having found a due process violation, I would require that the fruits of that illegality be suppressed in respondent's criminal prosecution. *Mapp* v. *Ohio,* 367 U. S. 643 (1961). Accordingly, under my analysis, it would be unnecessary to consider the scope of our supervisory powers, discussed in Part IV of the Court's opinion. Because, however, the Court addresses that issue, I must register my profound disagreement with both its reasoning and ultimate conclusion.

In determining that the exclusionary rule is an unwarranted sanction for the agency misconduct here, the Court attaches great significance to the agents' ostensible "good faith" in construing their own regulations to permit "emergency" surveillance of respondent in January and February 1975. *Ante,* at 757, 756. The record does not admit of such a charitable characterization. IRS Agent Yee alleged that respondent first attempted to bribe him in March 1974. The IRS recorded a conversation between Caceres and Yee that same month. No further contact with Caceres concerning the bribe occurred until January 1975, and no reasons have been offered for Agent Yee's failure to initiate surveillance during that 10-month hiatus. Nor does the record reflect any justification for the agency's failure to obtain approval for monitoring between the January 27 and January 31 meetings, to schedule meetings so as to permit timely authorization requests, or to process the January 31 authorization request expeditiously. In positing that the agents had a colorable basis for believing that the January 31 and February 6 meetings

constituted "emergency situation[s]," see *ante,* at 756–757, the Court simply ignores the findings below that Agent Yee had absolute control over the scheduling of those conversations, and that any exigency was solely of the Government's own making.[8] This is plainly not an instance in which law enforcement officers have failed to grasp the nuances of constitutional doctrine in an area where the Court itself is sharply divided. Cf. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 417 (1971) (BURGER, C. J., dissenting); *Stone* v. *Powell,* 428 U. S. 465, 538–540 (1976) (WHITE, J., dissenting). Rather, the record demonstrates a breach of unambiguous and unquestionably applicable procedures.

Moreover, even assuming the good faith which the agency has failed to demonstrate, that consideration should not figure in our present analysis. Restricting application of the exclusionary rule to instances of bad faith would invite law enforcement officials to gamble that courts would grant absolution for all but the most egregious conduct. Since judges do not lightly cast aspersions on the motives of government officials, the suppression doctrine would be relegated to those rare circumstances where a litigant can prove insolent or calculated indifference to agency regulations. As we have noted in the context of Fourth Amendment violations, "[i]f subjective good faith alone were the test, . . . the people would be 'secure . . .' only in the discretion of the police." *Beck* v. *Ohio,* 379 U. S. 89, 97 (1964). Just as intent has not been determinative in Fourth Amendment cases, see, *e. g., Mincey* v. *Arizona,* 437 U. S. 385 (1978); *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975); *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), it should not be material here.

The Court next suggests that suppression is unnecessary in this case because "the Executive itself has provided for

---

[8] See 545 F. 2d 1182, 1187 (CA9 1976). For example, when Agent Yee proposed a meeting for the following day, Caceres responded: "I'll arrange my schedule to your convenience." App. 15.

internal sanctions in cases of knowing violations of the electronic-surveillance regulations." *Ante,* at 756 (footnote omitted). Significantly, however, the Court does not assert that the sanctions which exist in theory are effectively employed in practice. While "[s]elf-scrutiny is a lofty ideal," *Wolf* v. *Colorado,* 338 U. S. 25, 42 (1949) (Murphy, J., dissenting), nothing in the record before us indicates why IRS disciplinary procedures should enjoy the Court's special confidence. Quite the contrary, the circumstances surrounding the conception and continued operation of IRS authorization requirements illustrate a persistent indifference toward enforcement.[9] And abdication by the courts is unlikely to increase the agency's vigilance in disciplining or even discov-

---

[9] With respect to IRS officials' enthusiasm for self-discipline before and during the Senate investigation, Senator Long stated that "generally speaking, they have found wrongdoing only when the subcommittee has pointed directly and explicitly to it." S. Res. 39 Hearings 1118.

Since that investigation, the agency's performance has remained less than exemplary. In 1974, an internal audit of electronic surveillance within the IRS Intelligence Division revealed that 18 agents had engaged in 35 to 40 "instances" of improper monitoring within the previous year, with an "instance" defined to include as many as 15 different phone calls. Oversight Hearings into the Operations of the IRS before a Subcommittee of the House Committee on Government Operations, 94th Cong., 1st Sess., 426–431, 450 (1975) (hereinafter Oversight Hearings). None of these employees were dismissed or demoted. In only one case did violations even actuate suspension. There, an employee who monitored his home telephone for "personal reasons completely unrelated to his official duties" was suspended for five days. *Id.,* at 451; Reply Brief for United States 17, and n. 9. Four other employees received written reprimands. Eight received oral admonitions, three of which were confirmed in writing and none of which became part of the agents' personnel folders. Oversight Hearings 451, 453. The Service took no action in five cases. *Id.,* at 451.

Such nominal sanctions hardly justify the Court's faith in agency self-restraint, particularly given the Government's failure to identify a single instance of internal disciplinary action by the IRS since 1974. See Reply Brief for United States 16–17.

ering violations. To remove a defendant's incentive for exposing evasions or disingenuous constructions of applicable rules will inevitably diminish the agency's interest in self-monitoring.[10]

Finally, the Court declines to order suppression because "a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures." *Ante,* at 755–756. No support is offered for that speculation. In fact, all available evidence is to the contrary. Since 1967, the IRS has retained regulations requiring agents to give *Miranda* warnings in noncustodial settings despite Court of Appeals decisions suppressing statements taken in violation of those rules. *United States* v. *Sourapas,* 515 F. 2d 295, 298 (CA9 1975); *United States* v. *Leahey,* 434 F. 2d 7 (CA1 1970); *United States* v. *Heffner,* 420 F. 2d 809 (CA4 1969). Significantly, the Court points to no instance in which an agency has withdrawn the procedural protections made meaningful by decisions such as *Bridges* v. *Wixon,* 326 U. S. 135 (1945), *United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S. 260 (1954), *Service* v. *Dulles,* 354 U. S. 363 (1957), and *Vitarelli* v. *Seaton,* 359 U. S. 535 (1959).

Even if the majority's concern about inhibiting agency self-regulation were more solidly grounded, it could not justify the result in this case. Under today's decision, regulations

---

[10] Professor Amsterdam, whom the majority cites for the proposition that regulations governing investigatory conduct "may well provide more valuable protection to the public at large than the deterrence flowing from the occasional exclusion of items of evidence," *ante,* at 755, and n. 23, submits in the same article that federal review of compliance with such regulations through the exclusionary rule "remains essential." Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 429 (1974). As he maintains, the suppression doctrine provides the "necessary occasions" for review of administrative problems and circumventions, and affords the "only available incentive" for law enforcement officials to make internal rules clear and incorporate them in personnel training. *Ibid.*

largely unenforced by the IRS will be unenforceable by the courts.[11] I cannot share the Court's apparent conviction that much would be lost if the agency were to withdraw such rules in protest against judicial enforcement. Presumably Congress, which has been repeatedly dissuaded by the IRS from legislating in the area,[12] would then step into the breach.. In the event of congressional action, this Court could not so cavalierly tolerate unauthorized electronic surveillance. See *Miller v. United States*, 357 U. S. 301 (1958).[13] Particularly where, as here, agency regulations were designed to stand in the place of legislative action, we should not hesitate to give them similar force and effect.

In my judgment, the Court has utterly failed to demonstrate why the exclusionary rule is inappropriate under the circumstances presented here. Equally disturbing is the majority's refusal even to acknowledge countervailing considerations. Quite apart from specific deterrence, there are significant values served by a rule that excludes evidence secured by lawless enforcement of the law. Denying an agency the fruits of noncompliance gives credibility to the due

---

[11] See n. 9, *supra*. Significantly, the Court does not suggest APA litigation as a plausible alternative means of enforcing investigative regulations. Unless a criminal prosecution is initiated, an individual is unlikely to discover that he was subject to unauthorized surveillance. And it strains credulity to suppose that an individual under criminal indictment would assume the expense, not to mention the risks of antagonizing government officials, that would attend APA proceedings. Cf. Amsterdam, The Supreme Court and the Rights of Suspects in Criminal Cases, 45 N. Y. U. L. Rev. 785, 787 (1970).

[12] See S. Res. 39 Hearings 1122–1124, 1144 (testimony of Commissioner Cohen); Oversight Hearings 401 (testimony of Commissioner Alexander); *id.*, at 448 (testimony of Assistant Commissioner for Compliance Wolfe).

[13] In *Miller*, the Court suppressed evidence obtained after District of Columbia police forcibly entered an apartment without announcing their authority and purpose as required by a federal statute made applicable in the District by a ruling.

process and privacy interests implicated by its conduct.[14] Also, and perhaps more significantly, exclusion reaffirms the Judiciary's commitment to those values. Preservation of judicial integrity demands that unlawful intrusions on privacy should "find no sanction in the judgments of the courts." *Weeks* v. *United States,* 232 U. S. 383, 392 (1914). See *Elkins* v. *United States,* 364 U. S. 206, 222–223 (1960). Today's holding necessarily confers upon the Judiciary a "taint of partnership in official lawlessness." *United States* v. *Calandra,* 414 U. S. 338, 357 (1974) (BRENNAN, J., dissenting). I decline to participate in that venture.

I would affirm the judgment of the court below.

---

[14] See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 756 (1970) (by demonstrating that society attaches serious consequences to unlawful infringement of privacy interests, "the exclusionary rule invokes and magnifies the moral and educative force of the law. Over the long term this may integrate some fourth amendment ideals into the value system or norms of behavior of law enforcement agencies").