BAKER, Judge,
with whom EFFRON, Chief Judge, joins (dissenting):
I disagree with the majority’s conclusion that there was no command-directed urinalysis program at Westover Air Reserve Base (ARB). To the contrary, the installation *309 commander established a program under Military Rule of Evidence (M.R.E.) 313; Appellee was selected to provide a urinalysis by a neutral official who used an authorized random selection process compliant with M.R.E. 313; Appellee provided a sample; the result was positive; and, it was admissible under M.R.E. 313. Therefore, I would reverse the decision of the United States Air Force Court of Criminal Appeals. Moreover, the lawful order analysis applied by the military judge in suppressing the urinalysis in this case, is confusing and off-target and should not be affirmed by this Court. As a result, I respectfully dissent.
The majority invalidates the result of Appellee’s urinalysis test on the grounds that:
(1) “[T]he Government failed to establish that any commander in appellee’s chain of command directed that a test be conducted”;
(2) There is “no evidence” that there was a command-directed drug testing program at Westover Air Reserve Base; and
(3) “[Tjhere is nothing that connects the letter directing Appellee to test with a legitimate exercise of command authority.”
United States v. Miller, 66 M.J. at 308 (C.AA.F.2008).
In my view, each of these conclusions is erroneous based on the following facts and analysis:
First, Air Force Instruction 44-120 states at the top in bold type: “BY ORDER OF THE SECRETARY OF THE AIR FORCE.” Dep’t of the Air Force, Instr. 44-120, Drug Abuse Testing Program at 1 (July 1, 2000) [hereinafter AFI 44-120]. It also states: “COMPLIANCE WITH THIS PUBLICATION IS MANDATORY.” Further, the instruction directs commanders to ensure that drug abuse testing programs aboard their installations are conducted in accordance with all applicable higher headquarters guidance. Id. para., 4.7.1.1. It also directs that random inspections “should be the predominate type of test used.” Id. para. 4.7.I.2. In essence, the instruction assigns overall responsibility for drug program implementation to installation commanders.
Second, AFI 44-120 directs that the Reserve Medical Unit Commander (in the ease of a reserve base) shall serve as the office of primary responsibility for installation drug testing programs. Id. para. 4.7.2.
Third, the publicly accessible website for Westover Air Reserve Base lists Brigadier General (Brig Gen) Wallace W. Farris Jr. as “commander of the Air Force Reserve Command’s 439th Airlift Wing, Westover Air Reserve Base, Mass.” Westover Air Reserve Base, http://www.westover.afrc.af. mil Oast visited Apr. 4, 2008). Brig Gen Farris is the most senior officer listed and there is no other officer listed as the base commander.
Fourth, the record includes a copy of Aerospace Medicine Squadron Operating Instruction 44-104 promulgated on January 4, 2005, “BY ORDER OF THE COMMANDER 439th AEROSPACE MEDICINE SQUADRON.” Dep’t of the Air Force, Aerospace Medicine Operating Instr. 44-104, Drug Abuse Testing Program at 1 (Jan. 4, 2005) [hereinafter AMDS Operating Instruction]. According to the website, the 439th Aerospace Medicine Squadron is a subordinate command under the 439th Airlift Wing at Westover ARB. The second sentence of the AMDS Operating Instruction states that it “directs the 439th Aerospace Medicines Squadron’s responsibilities in the Drag Demand Reduction Control Program at West-over ARB, MA.” Id. (emphasis added). The defense did not contend at trial, and the military judge did not find, that the AMDS Operating Instruction was invalid, or that Appellee was not subject to the instruction. On the contrary, both parties and the military judge proceeded on the basis that the program was in existence and that Appellee was subject to it.
Finally, this directive states that “Once selected and notified for testing, only [the] 439th Airlift Wing Commander can release an individual from testing.” Id. para. 4.2.
Based on the foregoing, the medical squadron generated Appellee’s name through random selection and conveyed his *310 name to Major (Maj) Ryan for notification. Thus, Appellee was directed to undergo random urinalysis based on the authority of the installation commander, Brig Gen Farris, pursuant to the Secretary of the Air Force’s directive. Brig Gen Farris exercised his command authority through the Aerospace Medicine Squadron, as provided in the AFI 144-120.
Notwithstanding the existence of these two directives, the majority leaves one to conclude that: (1) Brig Gen Farris ignored the secretary’s directive to establish a urinalysis program, (2) the Aerospace Medicine Squadron commander purportedly acted with the authority of the installation commander without having in fact received authority from the installation commander to do so, and/or (3) individuals selected for testing could obtain permission from the wing commander for exemption from a urinalysis program that, according to the majority, was never authorized by him in the first place. A more precise record might indicate exactly when, where, and how the installation commander, or his predecessors, ordered implementation of the base urinalysis program. Nonetheless, this record conclusively indicates that the program at Westover, ARB, was conducted as an incident of command.
As a result, any legal issues surrounding Maj Ryan’s authority to issue an order are not relevant.[1] As indicated during his testimony, Maj Ryan was performing a ministerial function in communicating to Appellee his selection for random urinalysis pursuant to the base testing program.[2] Thus, as the Government has noted, the real issue is not whether the order signed by Maj Ryan was lawful, but rather, whether the urinalysis inspection was administered properly as an incident of command in accordance with M.R.E. 313. The short answer is yes; it was conducted as an incident of Brig Gen Farris’s command in accordance with the requirements set forth by the Secretary of the Air Force.
As a separate matter, I think it important for this Court to distinguish its analysis from that used at trial. The military judge’s analysis is erroneous as applied to M.R.E. 313. The military judge erred by focusing on the authority to issue a punitive order under Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892 (2000). There is no requirement under M.R.E. 313 that an individual be notified of his/her selection to participate in an inspection through a punitive order under Article 92, UCMJ. If the service chooses to enhance its management of the urinalysis program by requiring issuance of a punitive and enforceable order, that is a matter of internal management. A regulation providing for communication of selection through a punitive order, although permissible, is not required. Such a regulation is for the benefit of the service, not the individual, and does not create an individual right to exclude evidence under M.R.E. 313. See United States v. Caceres, 440 U.S. 741, 752-53, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). The critical question is whether such an inspection is conducted as an incident of command consistent with M.R.E. 313.
Further, the analysis is problematic to the extent it is viewed as applying to lawful orders generally. Quoting an Air Force Instruction and an Air Force Court of Criminal Appeals case, the military judge concluded:
For an “inspection order” or order to submit to a random urinalysis to be lawful there must be, inter alia, a unity of status between the commander who issues the order and the subordinate who receives the order. “Commanders must have unity of status with their troops to fully enforce their orders. Conversely, before exposing a member who is subjected to the UCMJ to disciplinary action for an offense based on a commander’s order, it is evident that *311 both the member and the commander must be subject to the UCMJ.”
“Although they may hold supervisory positions and provide work direction, civilians cannot command Air Force units----”
Emphasis and citations omitted. Based on these factors the military judge further concluded that Maj Ryan “was not on active duty, was not subjected to the UCMJ and thus did not have unity of status with the Accused ... As such ... Major [Ryan’s] 12 September 2006 written order to the Accused to provide a urine sample was unlawful.” The concepts of “unity of status,” jurisdiction under the UCMJ, and “command” may be helpful in determining whether an action is taken as an “incident of command.”[3] Certainly, if an inspection is not conducted as an incident of command (or is not otherwise authorized), then an order to submit to such an inspection would not be lawful. These factors may also be helpful in determining whether to prosecute under Article 92, UCMJ. However, these factors are not generally determinative as to whether an order is “lawful” when this term is used in a more common vernacular as opposed to its meaning under Article 92, UCMJ. For sure, Maj/ Mr. Ryan could not have issued a lawful order while acting in his civilian capacity. However, the President, Secretary of Defense, and Secretary of the Air Force most certainly can issue “lawful” orders to military personnel, notwithstanding the absence of any unity of status with the military personnel over whom they exercise constitutional and statutory command, in the case of the President and the Secretary of Defense,[4] or administrative control, in the case of the Secretary of the Air Force. Recall that AFI 44-120, at issue in this case, was transmitted in the form of an “ORDER” from the Secretary of the Air Force.
Reliance on the factors enunciated by the military judge to determine whether an order is lawful might also place in doubt the status of many general, or standing orders, if applied literally and not otherwise limited to questions involving M.R.E. 313. Consider, for instance, the case of a commanding general’s standing orders that remain in effect after the general leaves command and thus, loses “unity of status” with the members of that command.

. It might be a different matter had Appellee been charged with violating Maj Ryan's order, but here the only matter in issue was the procedure used to seize Appellee’s urine.

. Maj Ryan himself testified that he was not issuing an order at the time he directed Appellee to report for a urinalysis, instead he was performing the ministerial function of notification incident to the installation commander’s directive that Appellee submit to a urinalysis.

. I say “may,” because the nomenclature seems to be drafted for lawyers by lawyers, rather than for those personnel who most need to understand the concept of lawful command, the officers who exercise it and the airmen who are subject to it.

. "Unless otherwise directed by the President, the chain of command to a unified or specified combatant command runs—
(1) from the President to the Secretary of Defense; and
(2) from the Secretary of Defense to the commander of the combatant command.”
10U.S.C. § 162(b) (2000).