UNITED STATES of America,

v.

**Earl Davis LONG.**

**Crim. No. 3:91–559.**

United States District Court,
D. South Carolina,
Columbia Division.

Oct. 5, 1992.

**1088**

Eric William Ruschky, Asst. U.S. Atty., Columbia, S.C., for U.S.

David M. Ratchford, Ratchford and Associates, Columbia, S.C., for Earl Davis Long.

### ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This matter is before the court upon the motion of the Defendant, Earl Davis Long, for suppression of all evidence, dismissal of the indictment, judgment of acquittal and a new trial. The court finds that the motions are without merit and hereby denies all four motions.

Long was a senior window technician at the main post office in Columbia, South Carolina. On June 3, 1988, he experienced a nervous breakdown while on the job. He saw Dr. Frank E. Forsthoefel, a local psychiatrist, on June 13. Forsthoefel diagnosed Long as completely disabled because of depression. On June 15, Long filed a Notice of Occupational Disease and Claim for Compensation with the Office of Workers' Compensation Programs of the United States Department of Labor. The Department of Labor acted on his application in March 1989 and Long began receiving disability insurance benefits in May 1989.

When Long applied for disability payments, he was required to furnish to the government a verified statement regarding his income. On several occasions while he was receiving disability payments, the Department of Labor sent Long a questionnaire requesting, *inter alia*, information concerning his income. Long's right to receive the disability payments for his mental disability is not in dispute in this case. Long's application for and receipt of disability payments for his mental disability did not make it illegal for him to engage in work activity and be paid for this work. The only legal obligation imposed upon Long during the relevant time period was the obligation to accurately report the money he received from his work when he applied for disability payments and periodically while he was receiving these payments. 20 C.F.R. § 10.125 (1992).

The indictment charges that on four occasions between February 17, 1989, and July 28, 1989, Long knowingly and willfully made a false statement to the Department of Labor regarding the amount of his income. It is undisputed that prior to and following his departure from the postal service, Long, in partnership with Holt Dye, constructed numerous boat docks for lakefront property owners at Lake Murray, South Carolina. At trial, Long did not dispute his involvement in the dock building activity—indeed, he contended that this was a form of therapy prescribed by Dr. Forsthoefel. Long contended, however, that he did not earn income from this work. He asserted that his partner, Dye, kept all of the profit earned, and thus there was no income for him to report. Most of the property owners testified that they paid Dye and Long in cash. The government contends that Long did, in fact, earn income which he failed to properly report to the Department of Labor. The government's case at trial consisted primarily of circumstantial evidence tending to show that Long had failed to properly report his income.

On the morning the trial was to commence, literally minutes before the jury was to be brought into the courtroom, Long moved to suppress all the evidence which had been collected by the government to be used against him at trial. The basis for this motion was Long's contention that investigators from the wrong agency of the United States government had gathered the evidence. Specifically, he contended that inspectors employed by the postal service did not have the authority to investigate false statements made to the Office of Workers' Compensation programs of the Department of Labor. Both sides agreed that because the postal inspectors had garnered all of the evidence to be used at trial, granting Long's motion to suppress the evidence would be tantamount to a dismiss-

al of the case. Defense counsel did not furnish any authority in support of his motion and the government, unaware that the motion was to be made on the morning of trial, was obviously not prepared to argue against it. Rather than decide the question on an inadequate record or incur a substantial delay in the trial, the court took the matter under advisement, directed counsel to fully brief the issue, and ordered that the trial begin as scheduled. The government agreed that if the jury found Long guilty and the court later sided with Long on the suppression issue, the conviction would be vacated because, as noted above, suppression of the evidence would destroy the government's entire case.[1]

Trial commenced on May 11, 1992. After a seven day trial, the jury found Long guilty on counts 1, 2, and 3 of the indictment.

## I. MOTION TO SUPPRESS THE EVIDENCE

■ The Federal Rules of Criminal Procedure specifically provide that motions to suppress evidence "must" be raised prior to trial. Fed.R.Crim.P. 12(b)(3). The advisory notes also state that "Subdivision (b)(3) makes it clear that objections to evidence on the ground that it was illegally obtained must be raised prior to trial." Fed.R.Crim.P. 12(b) advisory notes on 1974

Amendments.[2] Rule 12(b)(3) requires the parties to make motions to suppress prior to trial because it "gives the court notice that evidence has been illegally obtained so that it will not be compelled to stop the trial to consider the issue." CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, § 673, at 766–67 (1982).[3] "Failure to move to suppress evidence before trial is a waiver of the objection." Id. at 767.

In this case, the postal inspectors had conducted the investigation from the beginning, and Long and his counsel were well aware of this fact. The court held three pretrial conferences in the case prior to trial. Thus, the court clearly afforded the defendant the opportunity to raise the motion prior to trial, as anticipated by the Federal Rules of Criminal Procedure. Id. at 766 ("Thus motions to suppress evidence must be made prior to trial, at a date set by the district court." (emphasis added)).[4] Long did not move to suppress the evidence on this ground at any of these pretrial conferences; rather, he made the motion only a few minutes before the trial was scheduled to begin. The court, therefore, finds that Long's motion to suppress was untimely.

■ The court also finds that the motion to suppress all of the evidence fails as a matter of law. Long relies on the language in the Code of Federal Regulations

---

1. While at first blush, it might appear to be unfair to force a defendant to trial while at the same time taking under advisement a motion which would have the effect of rendering a trial unnecessary, it should be noted that the trial had already been continued on several occasions, the jury had reported to the courthouse and was ready to begin, and the motion, which appeared to raise novel issues of law, was unsupported by any authority. Developments such as these pointedly demonstrate the considerations that underlie the requirement that motions to suppress evidence be made prior to trial. *See infra* note 3 and accompanying text.

2. Prior to 1972, Rule 41(e) of the Federal Rules of Criminal Procedure provided that a motion to suppress based upon an illegal seizure "shall be made before trial or hearing unless opportunity therefore did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing." Fed.R.Crim.P. 41(e) (1972). The current Rule 41(f) provides

that "[a] motion to suppress evidence may be made in the court of the district of trial as provided in Rule 12." Fed.R.Crim.P. 41(f).

3. Not only would a contrary rule cause delay in the judicial system, it would also be extremely prejudicial to the government to allow the defendant to wait until the day of trial to make suppression motions that the defendant was aware of, but failed to make, at the pretrial conference. If the defendant raises and succeeds at a suppression hearing prior to trial, the government may be afforded an opportunity to discover and present other evidence. A policy allowing the defendant to withhold until trial its motion to suppress, when the defendant has known of the ground for seeking suppression well in advance of trial, is untenable.

4. The court's scheduling order established a deadline of January 7, 1992 for filing of all motions. Long's motion to suppress was filed some four months after the deadline expired.

which provides that the investigative powers of the postal inspectors shall be exercised:

> only in the enforcement of laws regarding property of the United States in the custody of the Postal Service, including property of the Postal Service, the use of the mails, and other postal offenses.

39 C.F.R. § 233.1(b) (1988).[5] Long asserts that the investigation conducted by the postal inspectors in this case, Greer W. Shafer and Raymond M. Ezell, exceeded the grant of authority contained in the regulation. Long contends that because the postal inspectors exceeded the authority given to them by the federal regulations, the evidence obtained by them during their investigation is inadmissible under the "fruit of the poisonous tree" doctrine.[6]

The court finds that the evidence discovered by the postal inspectors is admissible because the investigation was not outside the postal inspectors' authority. Additionally, even if the postal inspectors lacked authority to conduct this investigation, a regulatory violation of this nature does not rise to the level of a constitutional deprivation.

The federal regulations of the postal service consist of "handbooks ... and other regulatory issuances and directives of the Postal Service [which] may be published in the Federal Register and the Code of Federal Regulations." 39 C.F.R. § 211.2(a)(3). The Inspection Service Manual is such a handbook, although it is not published because it contains restricted information, particularly regarding investigative techniques of the Postal Inspection Service. This manual provides as follows:

> The [Postal] Inspection Service is responsible for protecting postal funds from fraud and abuse. The Department of

Labor Office of the Inspector General, also has the responsibility for frauds against the Office of Workers' Compensation Programs (OWCP). Consequently, responsibility for postal employees defrauding OWCP is concurrent between the two investigative agencies.

Inspection Service Manual § 515.12. Thus, the postal inspectors had the authority to conduct the investigation pursuant to the Inspection Manual.

■ Even if the postal inspectors acted outside the scope of their authority in conducting the investigation, this fact alone is not sufficient grounds for suppressing the evidence because it fails to rise to the level of a constitutional deprivation. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). In *Caceres*, an Internal Revenue Service criminal investigator violated IRS regulations by recording, without prior approval, conversations with a taxpayer accused of bribing the investigator. The United States Supreme Court held that the taxpayer could not suppress the recordings on the ground that they were obtained in violation of the IRS regulations. *Id.* at 744, 99 S.Ct. at 1467. The Court stated that the IRS regulations regarding recordings were not required by the Constitution or statute. *Id.* The Court recognized that a person may seek to invalidate agency action on the ground that the agency lacked authority, but the Court distinguished that procedure from the exclusionary rule applied in criminal prosecutions:

> But this is not an APA case, and the remedy sought is not invalidation of the agency action. Rather, we are dealing with a criminal prosecution in which respondent seeks judicial enforcement of

**5.** The quoted language is taken from the regulations as they existed at the time of the Long investigation in 1988. This particular regulation has since been amended, but the technical changes are of no consequence to the issue raised by the defendant.

**6.** The first of the poisonous tree doctrine is a body of law representing an extension of the exclusionary rule of the Fourth Amendment. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The doctrine

stands for the proposition that evidence illegally obtained shall not be used for the purpose of gaining other evidence. Once the original evidence (the "tree") is shown to have been unlawfully obtained, all evidence stemming from it (the "fruit") is equally unusable. *See id.* at 484, 83 S.Ct. at 414. Long has been unable to provide any authority for applying this doctrine to the events of his case and the court's independent research has found none.

the agency regulations by means of the exclusionary rule. That rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial. In view of our conclusion that none of respondent's constitutional rights has been violated here, either by the actual recording or by the agency violation of its own regulations, our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.

*Id.* at 754–55, 99 S.Ct. at 1473.

In the present case, the postal investigators did not violate any of Long's constitutional or statutory rights. Furthermore, Long cannot complain of any prejudice resulting from Shafer and Ezell conducting the investigation.[7]

For the foregoing reasons, the court finds that Long's motion to suppress all of the evidence obtained by the postal inspectors' investigation is untimely and without merit and is hereby denied.

## II. MOTION TO DISMISS

■ Prior to trial, Long moved for an order prohibiting the government from introducing Long's grand jury testimony. The motion was grounded upon the assertion that Long's undisputed mental disability rendered him incapable of giving competent testimony to the grand jury. Prior to the commencement of the trial, the court conducted a hearing on this issue, and Long produced Dr. Forsthoefel, who testified that Long's mental condition rendered him "incapable of producing reliable testimony." Dr. Forsthoefel's testimony was not contradicted by the government,[8] and the court granted the motion in limine and

prohibited any use of the grand jury testimony at trial.

After the jury rendered its guilty verdict, Long moved to dismiss the indictment upon the ground that the grand jury proceeding was defective. Long reasons that because the court disallowed the use of the grand jury testimony at trial, it necessarily follows that the grand jury proceeding was itself tainted, requiring a dismissal of all charges.

The Federal Rules of Criminal Procedure provide that "[d]efenses and objections based on defects in the institution of the prosecution" must be raised prior to trial. Fed.R.Crim.P. 12(b)(1). Failure to raise the motion prior to trial constitutes a waiver. *See* Fed.R.Crim.P. 12(b), note to subdivision (b)(1) and (2) (1991).

As noted above, Long moved at the pretrial conference to exclude the grand jury testimony as evidence in the trial on the ground that he was incompetent to testify. Long could have easily made the motion to dismiss the indictment at the same time. Instead he waited until after trial. Consistent with Rule 12(b)(1), the court finds the motion to be untimely.

■ The court also finds that the motion to dismiss is groundless. In *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), the Court clearly stated that an indictment is not to be dismissed because incompetent evidence was presented to the grand jury:

In *Holt v. United States*, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021 (1910)], this Court had to decide whether an indictment should be quashed because supported in part by incompetent evidence. Aside from the incompetent evidence "there was very little evidence against the accused." The Court refused to hold that such an indictment should be quashed, pointing out that "The abuses of criminal practice would be enhanced if

---

7. Even if the evidence had been improperly gathered, it may have been admissible if the postal service investigators acted in good faith believing they had the authority to act. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

8. This motion was made at the second of three pretrial conferences conducted only seven days before trial was to begin. The government contended that it did not have time to secure a medical expert on this issue.

indictments could be upset on such a ground." 218 U.S. at 248 [31 S.Ct. at 4]. The same thing is true where as here all the evidence before the grand jury, was in the nature of "hearsay." If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

*Id.* at 363, 76 S.Ct. at 408.

The United States Supreme Court has also recently held that district court does not have the authority under its supervisory powers to dismiss an indictment when the prosecutor failed to present substantial exculpatory evidence to the grand jury. *United States v. Williams,* — U.S. —, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). The Court recognized that "neither in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify, or to have exculpatory evidence presented." *Id.* — U.S. at —, 112 S.Ct. at 1744. The Court further stated, "[i]t is axiomatic that

the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge. That has always been so; and to make the assessment it has always been thought sufficient to hear only the prosecutor's side." *Id.*

Long's mental condition does not grant him the right to challenge the grand jury indictment. It is well established that a defendant has no constitutional right to testify at the grand jury hearing.[9] *Duke v. United States,* 90 F.2d 840, 841 (4th Cir.), *cert. denied,* 302 U.S. 685, 58 S.Ct. 33, 82 L.Ed. 528 (1937); *Stevens v. State,* 638 F.Supp. 1255, 1257 (W.D.N.C.1986). Furthermore, as discussed above, the prosecutor is not required to provide any exculpatory evidence. Accordingly, it follows that Long's mental condition, even if it "rendered him incapable of producing reliable testimony,"[10] does not grant him the right to challenge the grand jury indictment.

■ Moreover, pursuant to *Holt* and *Costello,* Long cannot challenge the indictment merely because the grand jury considered incompetent or unreliable evidence. Therefore, Long's motion to dismiss the indictment is hereby denied.

### III. MOTION FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

Long filed two different motions asserting twenty-two different grounds for either a judgment of acquittal or for a new trial.[11]

---

**9.** Long requested permission to testify before the grand jury. Prior to giving his statement to the grand jury, Long was warned by Assistant United States Attorney Eric Ruschky that he was the target of an investigation, that he was not being asked to testify, and that any statements Long made "may be used against you by the grand jury or in a later legal proceeding." Transcript of December 3 grand jury proceedings at 1–3.

**10.** The quoted language is the defendant's characterization of Dr. Forsthoefel's testimony. The court has not adopted this characterization of the defendant's condition. The court merely disallowed the use of the defendant's grand jury testimony at trial because the uncontradicted, yet not necessarily credible, medical testimony

indicated that Long was incompetent at the time of the grand jury testimony.

**11.** Some of the grounds set out in the defendant's motion as the basis for relief state ultimate conclusions, without specifying the error which is sought to be raised. For example, the defendant's first three reasons for obtaining a new trial, stated in their entirety, are as follows:

1. Prejudice against defendant has resulted.
2. The interest of justice requires a new trial.
3. A substantial right of the defendant was affected by the erroneous ruling.

Other grounds simply seek to have the court revisit each and every disputed issue which was decided by the court. For example, the defendant makes the broad assertion that the "evidentiary rulings" of the court were in "[v]iolation of

In his memoranda in support of his motions, however, Long elaborates on only two specific objections. Long asserts that (1) the court should not have admitted the 1988 personal income tax return of Holt Dye, and (2) the court should not have admitted evidence in the form of charts and summaries of Long's financial transactions.

### A. Holt Dye's 1988 Tax Return

■ Long contends that the court admitted the tax returns of Holt Dye pursuant to Federal Rule of Evidence 404(b). Long further contends that Dye's 1988 tax return is in no way relevant to the issue of whether Long made materially false statements to the Department of Labor and that Dye's 1988 tax returns, even if they show some type of similar bad act, cannot be imputed to Long.

Long misconstrues the court's ruling. The court did not admit Dye's tax returns pursuant to Rule 404(b) of the Federal Rules of Evidence.[12] The court admitted Dye's 1988 tax return as circumstantial evidence that Long was receiving income. It was undisputed that prior to Long's disability Long and Dye were partners in the dock building business and shared the profits. According to the testimony of Long and Dye, after Long filed for disability, Long and Dye continued to build docks and to receive money for their work, but Long no longer received any of the profit. Dye and Long were partners in a business, and the business records were, according to Dye's testimony, destroyed by a dog. Thus, the tax returns of Dye and Long were the only records of the income earned in the dock building business. Dye reported a relatively modest amount of income from the dock building business in 1988.[13]

In 1990, he requested two extensions of time for filing his 1989 tax return, during which time Long and Dye were aware of the investigation, and then Dye later reported $33,650 in gross revenue and $7,199 in net profit from the dock building business. The combination of Long's 1988 tax return and Dye's 1988 tax return indicates that the business was making very little money. The 1989 tax return of Dye showed that the dock building business of Long and Dye was producing significant income. Dye's 1988 and 1989 tax returns are relevant to show how much profit that the two partners were claiming that their dock building business made during the two years. The fact that Dye requested two extensions of time and later reported a substantially larger figure for 1989 after the postal inspectors disclosed to Long the incriminating information they had discovered tended to show that Dye and Long had been working together to hide the income.

The court therefore reaffirms its earlier ruling that Dye's tax returns were admissible.

### B. Charts and Summaries

■ Long contends that the charts and summaries of his financial transactions were not admissible because the government failed to lay the proper foundation. Analogizing this case to income tax fraud cases where the government attempts to prove unreported income under the "net worth" theory, Long asserts that the government had to first establish Long's net worth at the beginning of the relevant time period and that the government failed in doing so because the charts and summaries

[the] Federal Rules of Evidence [and] resulted in prejudicial error." Defendant's motion for a new trial, ¶ 10. This order purports to address the issues which Long saw fit to discuss in his memoranda in support of his motions. To the extent Long seeks to reassert his position on every issue on which he lost at trial, the motion is denied. This includes his motion for judgment of acquittal grounded upon the proposition that the verdict is against the manifest weight of the evidence.

12. Rule 404(b) provides that evidence of "other crimes, wrongs or acts" may be admissible as proof of "motive, opportunity, intent, prepara-

tion, plan, knowledge, identity or absence of mistake or accident." *Fed.R.Evid. 404(b).*

13. On his 1988 income tax return, Dye reported net income of $1,522 from "sales." He took the position that this income was from the dock business. The government, through cross examination, attempted to show that the bulk of this income was generated by Dye's mercantile business. Even if the evidence were construed to show that the $1,522 was from boat dock activity, this amount was significantly less than Dye belatedly reported in 1989.

did not consider all of Long's assets, such as his house, cars, and stamp collection. Instead, the charts and summaries only reflected Long's bank accounts, checking accounts, and stock brokerage accounts. Long also contends that, in preparing the charts, the government did not negate all non-reportable sources of income.

Long misstates what the charts and summaries purported to show. The charts and summaries demonstrated were introduced by the government primarily to show the correlation between the deposits into Long's accounts and the receipt of money by Dye and Long from their dock building business. In other words, the charts and summaries are admissible to show that Long received cash proceeds from the dock building business and deposited these proceeds into his accounts.

Long complains that in addition to showing a relationship between the completion of docks and financial transactions in one of Long's accounts, the charts and summaries contained beginning and ending balances which showed a $20,000 increase during the period covered by the charts. Thus, Long argues that the government was improperly attempting to embellish its case by proving an increase in his net worth, without complying with the prerequisites of the net worth theory of indirect proof utilized primarily in tax fraud cases. However, the charts and summaries were not admitted under a net worth theory. The government did not urge that the charts were admissible for purposes of proving an increase in net worth, and neither side requested a jury instruction on the net worth method of indirect proof. Furthermore, although this is not a tax fraud case, to the extent the charts are admissible under an indirect method of proof, the charts are more closely analogous to the bank deposits theory of circumstantial evidence. *See United States v. Boulet*, 577 F.2d 1165 (5th Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979); *Gleckman v. United States*, 80 F.2d 394 (8th Cir.1935) *cert. denied*, 297 U.S. 709, 56 S.Ct. 501, 80 L.Ed. 996 (1936).[14]

---

**14.** The net worth·method of indirect proof may be described as follows:

· The Government makes out a prima facie case under the net worth method of proof if it establishes the defendant's opening net worth (computed as assets at cost basis less liabilities) with reasonable certainty and then shows increases in his net worth for each year in question which, added to his nondeductible expenditures and excluding his known nontaxable receipts for the year, exceed his reported taxable income by a substantial amount. *See Holland v. United States*, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954); *McGarry v. United States*, 388 F.2d ,862, 864 (1st Cir.1967), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969). The jury may infer that the defendant's excess net worth increases represent unreported taxable income if the Government either shows a likely source, *Holland*, 348 U.S. at 137–38, 75 S.Ct. at 136, or negates all possible nontaxable sources, *United States v. Massei*, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958); the jury may further infer willfulness from the fact of under-reporting coupled with evidence of conduct by the defendant tending to mislead or conceal. *Holland*, 348 U.S. at 125, 75 S.Ct. at 130.

*U.S. v. Sorrentino*, 726 F.2d 876, 879–80 (1st Cir.1984).

The bank deposits method, on the other hand, involves the following:       .

Under this method, all deposits to the taxpayer's bank and similar accounts in a single year are added together to determine the gross deposits. An effort is made to identify amounts deposited that are non-taxable, such as gifts, transfers of money between accounts, repayment of loans and cash that the taxpayer had in his possession prior to that year that was deposited in a bank during that year. This process is called "purification." It results in a figure called net taxable bank deposits.

The government agent then adds the amount of expenditures made in cash, for example, in this case, cash the doctor received from fees, did not deposit, but gave to his wife to buy groceries. The total of this amount and net taxable bank deposits is deemed to equal gross income. This is in turn reduced by the applicable deductions and exemptions. The figure arrived at is considered to be "corrected taxable income." It is then compared with the taxable income reported by the taxpayer on his return.

*U.S. v. Boulet*, 577 F.2d 1165, 1167 (5th Cir. 1978).

The two methods differ mechanically in that the focus in a bank deposits case is on funds deposited during the tax year, while the net worth method considers year-end bank balances, as well as other assets and liabilities. But while "the mechanics of arriving at an income figure are different, both [the bank depos-

In *Boulet*, the Fifth Circuit recognized that the bank deposits method of proof requires the government to establish an accurate starting balance. The bank deposits method also places a duty on the government to negate the possibility that bank deposits or cash expenditures during the relevant period originated from non-taxable income. 577 F.2d at 1168. "The latter requirement may be satisfied by proof of an adequate investigation that did not disclose non-taxable sources." *Id.* If the government establishes that it conducted a thorough investigation, "the government is not required to negate all possible non-income sources of the deposits, particularly where the source of the income is uniquely within the knowledge of the taxpayer. At the same time, however, the government may not disregard explanations of the defendant reasonably susceptible of being checked." *Id.* at 1168–69 (quoting *United States v. Slutsky*, 487 F.2d 832, 841 (2d Cir.1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974)). The evidence showed that the government conducted a thorough investigation of Long's financial records. The government subpoenaed the records of several banks and stock brokerage accounts held by Long. The government reviewed Long's tax returns, and the government thoroughly investigated the revenues he received in the dock building business. The government also tried to meet with Long to discuss his financial records, but Long, upon advice of counsel, refused to answer the government's questions. Thus,

the court is satisfied that the government has met its burden of thoroughly investigating the starting balance and the non-taxable sources of income.

■ Long argues that the government has not negated all non-reportable sources of income. Significantly, however, a substantial portion of the non-taxable sources of income that Long alleged in this case—the sale of a car and the sale of puppies—was not disclosed to the government until the trial. The government cannot be expected to negate every conceivable theory of non-taxable income,[15] especially when the alleged source of income is uniquely within Long's knowledge and Long did not supply the government with the relevant information pursuant to the court's reciprocal discovery order.[16] "Information on nontaxable income should be supplied by the taxpayer." *United States v. Goldstein*, 685 F.2d 179, 182 (7th Cir.1982). Moreover, the government has clearly and unequivocally demonstrated a likely source which generated the income. Long had been a partner in a dock building business. He continued to work in the business, but he claims he declined all income from such work. Although "proof of a likely source of income does not suffice to relieve the prosecution of its duty to negate *probable sources* of non-taxable income," *id.* at 1168 (emphasis added), it is a factor that lessens the government's burden of negating all possible sources. *Compare United States v. Bethea*, 537 F.2d 1187, 1188–89 (4th Cir. 1976) (in a net worth case the government's

its method and the net worth method] involve similar underlying assumptions and afford much of the same inferences for and against the accused." *U.S. v. Hall*, 650 F.2d 994, 999 (9th Cir.1981).

15. The Fifth Circuit addressed this type of argument regarding the government's duty to negate all possible non-taxable sources of income with respect to a net worth theory of proof in *United States v. Hiett*, 581 F.2d 1199, 1201 (5th Cir. 1978):

To adopt appellant's position would require the government to exhaust the inexhaustible—to conduct an absolutely limitless investigation.... Appellant would require the government to embark on a Magellan-like expedition in order to prove that the unreported income

was taxable.... [O]ur jurisprudence ... cannot be read to sanction such a result.

16. Arguably, the sale of a car is not the type of non-taxable source of income which is uniquely within the defendant's knowledge, but is the type that the government should discover independently. The sale of the car, however, took place after the relevant time period. At trial, the defendant originally claimed that he received the money from the sale during the relevant time period, but that the title to the car was not transferred until later. Thus, the defendant's contention that he received the money some five months prior to the official sale is the type of information uniquely within his knowledge, and the government is not required to negate such a possibility.

proof must *either* "(1) [negate] all nontaxable sources of income *or* (2) [demonstrate] a likely taxable source which generated the income") (emphasis added).

██ Long also argues that the government's evidence under a net worth theory is inadequate because "[i]n meeting [its] burden, the government must introduce evidence, other than its own computations, to discredit the books and records of the taxpayer, such as proof of unrecorded transactions, or internal evidence within the books themselves showing incompleteness or inaccuracy." *United States v. Riganto*, 121 F.Supp. 158, 161 (D.Va.1954). The United States Supreme Court, however, rejected this analysis in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954):

> Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the selfserving declarations in a taxpayer's books.... To protect the revenue from those who do not "render true accounts," the Government must be free to use all legal evidence available to it in determining whether the story told by the taxpayer's books accurately reflects his financial history.

*Id.* at 131–32, 75 S.Ct. at 133–34.

Long's argument that the government must show inconsistencies or incompleteness in Long's books and records is less compelling in this case, in which Long has never produced any records concerning the dock building business.

Finally, although the evidence presented at trial is similar to the type evidence presented under the bank deposits method of proof, sole reliance on this method to justify the admissibility of the charts and summaries is unnecessary. This case is distinguishable from the bank deposit cases. In such cases, the government normally bases its case solely upon the unexplained deposits of cash into the defendant's bank accounts to prove the taxpayer's failure to report income. In this case the government has put forth strong and convincing evidence separate and apart from the evidence of the deposits in the bank accounts and the dramatic increase in Long's financial accounts: (1) evidence that Long and his partner were building docks and receiving money for the work; (2) evidence that Long shared in the profits from the dock building business prior to his disability; (3) Long's failure to inform many of his customers that he was working for free; (4) the absence of business records for the business; (5) the testimony of one witness that Long had told her he had to be careful about the money he received from dock building; (6) the deposits into Long's personal accounts shortly after the receipt of money from building docks; and (7) the unusually large sums of money that were handled in cash and in money orders during the relevant time period. Thus, the increase in the financial accounts combined with the unexplained source of income on which Long lived during the relevant time period was only one of several factors in the government's case of circumstantial evidence against Long. *See United States v. Horton*, 526 F.2d 884, 887 (5th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976) ("evidence of total bank deposits during the years in question was properly admissible as corroborative evidence in this specific item prosecution").

## CONCLUSION

For the foregoing reasons the court concludes that Long's motions are without merit. Such motions are, therefore, hereby denied.

IT IS SO ORDERED.