UNITED STATES of America, Plaintiff,

v.

James L. TENZER, Defendant.

No. 95 Cr. 1016(CLB).

United States District Court,
S.D. New York.

Sept. 10, 1996.

Mary Jo White, United States Attorney, Cynthia Keefe Dunn, Assistant United States Attorney, for Plaintiff.

William Wachtel, New York City, for Defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By motion docketed March 4, 1996, James L. Tenzer, the single defendant in a four count misdemeanor Information filed November 30, 1995, charging failure to file income tax returns, seeks to dismiss the Information on grounds that his Constitutional rights were violated by the filing of the charges, and that he is entitled to immunity granted by the Internal Revenue Service ("IRS"). Alternatively, Mr. Tenzer seeks to dismiss Count One on the ground that it is time barred and to suppress certain statements and documents received by the Government from Mr. Tenzer prior to the filing of the criminal Information and all leads and other derivative evidence derived therefrom.

For the most part, the motion is based on the IRS Voluntary Disclosure Policy (the "Policy") discussed below, and the so-called "Caceres doctrine" which holds that once an agency adopts regulations they are duty bound to obey them, even if the agency was not required by the Constitution to adopt

them in the first instance. The doctrine was set forth in United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), where the Supreme Court noted that:

"Our decisions in Lopez [v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963)] and [United States v.] White [401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971)] demonstrate that the IRS was not required by the Constitution to adopt these regulations.[14]

[Footnote 14 reads as follows:]

It does not necessarily follow, however, as a matter of either logic or law, that the Agency had no duty to obey them. 'Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required.' (Citations omitted.)

Id. at 751, n. 14, 99 S.Ct. at 1471, n. 14.

The misdemeanor Information charges defendant Tenzer with having unlawfully, willingly and knowingly failed to make income tax returns for the calendar years 1987, 1988, 1989 and 1990. The Information charges that during each of those years the gross income of the defendant ranged between $261,488.00 and $717,344.00.

The following facts were developed at an evidentiary hearing or are presumed to be true for purposes of the motion. Defendant himself did not testify at the hearing.

Mr. Tenzer is an experienced tax attorney and one of the principals of Margolin, Winer and Evens, described as a large accounting firm located in Long Island New York. It is clear that defendant received substantial income during the four years charged and paid little or no estimated tax. The primary source of his income was from approximately six partnerships. The fact of his existence and his receipt of funds from the partnerships was fully known at all times to the IRS. During the period 1976 through 1991, Mr. Tenzer filed his tax returns timely only for the years 1983, 1984, and 1985. Mr. Tenzer never filed any tax return at all, nor did he

pay any tax for the years 1978 and 1979.[1] During this period, the IRS treated the repeated incidents of late filing only as a civil, not a criminal matter, and did nothing about 1978 and 1979.

On February 29, 1988, the IRS sent Mr. Tenzer a computer generated notice stating "we have not received your tax return" for 1986, and requesting that a return be filed. (Gov.Ex. 2.) Additional notices were sent on April 25, 1988, (Gov.Ex. 3,) and June 6, 1988. (Gov.Ex. 4.) On July 18, 1988, the IRS sent another warning that "we may have to ... [b]egin criminal proceedings ... if you willfully fail to file a tax return." (Gov.Ex. 5.)

Despite these notices, the first evidence of Mr. Tenzer's intent to comply with IRS filing requirements did not occur until March 29, 1991, when he retained Steven Solomon, Esq., also an experienced tax practitioner, to assist him in filing his returns.

For many years, the Margolin firm, through Mr. Tenzer, acted as the tax accountants for a major real estate enterprise in Westchester County known as "JRD". JRD, its principals and several of its employees were under Grand Jury investigation, not only for income tax violations but for other crimes, including violations of the Taft Hartley law, making false statements and similar activities. This was a lengthy and elaborate investigation.

In July of 1991, the Margolin firm was notified by JRD that JRD had been served with a Federal Grand Jury subpoena seeking records in connection with a Title 26 tax investigation of JRD. In November 1991, the Margolin firm was itself served with a Federal Grand Jury subpoena calling for the production of the accounting firm's documents relating to JRD. This service was effected on Mr. Tenzer by Special Agent Trezza of the IRS, who testified before me. Mr. Trezza recalled that upon the service of the subpoena upon Mr. Tenzer, which showed on its face that it was in connection with an investigation of JRD under Section 7201 of Title 26, Mr. Tenzer displayed considerable nervousness and inquired whether "his personal taxes were the subject of the investigation." (Transcript, 394.) This was an unusual reaction for a tax accountant in the experience of Agent Trezza. While the Court finds Mr. Trezza's testimony credible in all respects, I decline to find the weight and significance which the Government attributes to this event. The Government now argues that this service of process (unrelated to Tenzer's own records) was a triggering event which constituted a "contact" by the IRS "notifying" the taxpayer that he was under criminal investigation for failure to file, a relevant issue under the Policy. This Court rejects this inference.

■ There is a high level of suspicion attached to Tenzer's activities as a possible aider and abettor of JRD's tax frauds. His nervousness, and inquiry about his own taxes may merely reflect a consciousness of guilt concerning JRD. Reading the Policy literally, service of a subpoena to produce the records of a crooked client does not, as a matter of law, arise to a level of notification that the record custodian's own failure to file was known, or under criminal investigation, and indeed, at that point in time it was not. This "triggering event" is also discounted by this Court's finding that by the spring of 1991, prior to the service of the JRD subpoena, Mr. Tenzer had retained Mr. Solomon to assist him in becoming current on his obligations to the IRS. (Transcript, 310.)

On October 7, 1991, by another computer generated notice as a result of activity unrelated to Mr. Trezza or the JRD investigation, the IRS notified Tenzer and his wife that due to their continued failure to respond to repeated inquiries, their accounts had been referred to enforcement action. The letter noted that Tenzer could still avoid enforcement action if he filed all delinquent returns and paid all outstanding taxes within ten days or if he immediately contacted the IRS by telephone.

Following receipt of this letter, Myron Weinberg, Esq., a law partner of Steven Solomon, called the IRS to pledge that the

---

1. Prosecution for the failure to file returns for these two years is now barred by the statute of limitations, and the right to collect is also lost.

returns would soon be filed, and requested additional time to do so. The IRS granted a series of extensions, through January 31, 1992. On February 10, 1992, Mr. Tenzer filed his tax returns for 1986, 1987, 1988, and 1989. The truthfulness of these returns was not questioned by the IRS at the time and they were "cleared for assessment." The returns were not accompanied with payment for his tax liabilities. Despite filing the returns, Mr. Tenzer failed to make any estimated tax payments throughout the year and thus did not remain current on his 1992 accruing taxes.

In September of 1992, Revenue Officer Elizabeth Kishlansky was assigned to collect the tax deficiency resulting from the returns as filed. On October 15, 1992, Revenue Officer Kishlansky met with Attorney Weinberg regarding the Tenzer matter. Weinberg advised Kishlansky that Tenzer was unable to make full payment, but instead wanted to enter into a Installment Agreement with the IRS whereby he would be allowed to make full payment to the IRS over time. Revenue Officer Kishlansky informed Weinberg that Tenzer would only be given 30 days, until November 16, 1992, to resolve the collection situation. Kishlansky also informed Weinberg that Tenzer would have to submit a financial statement to evaluate this proposed Installment Agreement, and if the situation was not resolved by that time, the IRS would take enforcement action by levy, seizure and/or administrative action.

On October 16, 1992, Revenue Officer Kishlansky filed liens in New York County and Nassau County to protect the IRS' interest. On October 22, 1992, Kishlansky learned that Tenzer had not filed his 1990 or 1991 tax returns. She then "demanded" that those returns be filed. (GX C; Tr. 446.) This was a "solicitation" of the 1990 return, which is the subject of Count Four of the Information. The effect of this is discussed below.

On November 13, 1992, Tenzer filed his tax returns for the years 1990 and 1991.

On January 8, 1993, Ms. Kishlansky attended a meeting with Tenzer's tax counsel Myron Weinberg, Steven Solomon, and newcomer Ernest Honecker, an attorney who formerly was employed with the IRS in the Chief Counsel's office. Mr. Honecker testified, and I find, that he asked Ms. Kishlansky at the start of the meeting for assurances that Mr. Tenzer's voluntary disclosure was being handled as a civil matter. Kishlansky assured Honecker that it was a civil matter and that she was there only for collection. Revenue Officer Kishlansky was informed that rather than enter into an Installment Agreement, Mr. Tenzer wished to submit an Offer in Compromise. Kishlansky advised the representatives that if Tenzer wanted an Offer in Compromise to be considered by the IRS, he would have to start becoming current on accruing taxes and make all required current estimated tax payments. Tenzer's representatives indicated that the Offer would be approximately $250,000. Because a financial statement submitted at that time indicated that Tenzer had substantial assets and significant earnings potential, Kishlansky estimated that a reasonable Offer would be closer to $600,000.

After the meeting, but on that same day, Kishlansky called Weinberg and demanded that Tenzer sell several assets and begin making monthly payments of $7,000 towards his tax liability. No such payments were never made by Mr. Tenzer.

In February, 1993, Tenzer submitted an Offer in Compromise to Revenue Officer Kishlansky, which covered the tax years 1986 through 1991. This document was prepared by Tenzer's team of lawyers led by IRS alumnus Honecker, pursuant to a practice commonly followed by persons who owe large amounts of unpaid income taxes. Kishlansky reviewed the Offer, and advised Mr. Honecker that the Offer would most likely be rejected due to its failure to take into consideration Tenzer's future earning potential and his ability to liquidate assets to generate available cash to pay the IRS, and also that the Offer failed to include 1992. However, Ms. Kishlansky determined that the Offer was not facially inadequate or made in bad faith, and forwarded the Offer to a service center in Maine for processing and review.

In early April of 1993, attorney Honecker learned that the Offer in Compromise had

been rejected. The Offer was rejected according to Honecker because of the Service's failure to discount Tenzer's non-liquid assets to their "forced sale" value. With news of the Offer's rejection, Honecker informed Kishlansky that he would be re-submitting the Offer, with whatever amendments were necessary to reflect Mr. Tenzer's current financial status.

Shortly after April 22, 1993, after having discussions with her Group Manager, Revenue Officer Kishlansky transferred the collections case to the Brooklyn office of the IRS, because Tenzer and his assets upon which to levy were located in Long Island. There the file became dormant.

The records of JRD called for in the subpoena issued in 1991 were produced in April, 1993. Special Agent Anthony Trezza of the Internal Revenue Service testified, and I find, that about May 14, 1993 he and others working with him found documents among records produced by the Margolin firm which supported an inference that Mr. Tenzer, "may have been a party to back-dating some [tax related corporate] documents" involved in the JRD investigation. This was the first occasion when Agent Trezza had reason to believe that Mr. Tenzer may have engaged in criminal conduct, essentially as an aider and abettor of tax evasion by JRD or its principals. Mr. Trezza, almost immediately thereafter, discussed his conclusions with AUSA Dunne of this District, who in turn informed Mr. William Wachtel, who was then representing the Margolin firm, that Mr. Tenzer along with another Margolin partner, was now a "subject" of a criminal investigation in connection with JRD. (Transcript 8.) Mr. Wachtel was not affiliated with the Solomon, Weinberg, Honecker group of lawyers who were dealing with the civil tax matter. Apparently his representation of Mr. Tenzer began in connection with Tenzer's status as a JRD subject.

Mr. Trezza testified that probably around June of 1993, he, or Special Agent Walter Gross, with whom he was working on the matter, obtained from a computer terminal, a transcript of Mr. Tenzer's account as to his personal taxes. At the time the transcript was obtained, the witness Trezza and his fellow agents regarded Tenzer only as a subject for assisting JRD or its principals in committing fraud as to JRD's tax obligations or those of its principals and affiliates. He sought the transcript "in order to get a tax Grand Jury approved" through the Department of Justice to consider this aiding and abetting charge. Special Agent Trezza testified that the IRS required that tax background on the individual be obtained and submitted with any request to enlarge an existing tax Grand Jury. Mr. Trezza explained (Transcript, 14), "where it is an accountant aiding and assisting somebody else we always request transcripts, because the attorneys that review our work want to see the IRS file on it." He testified that it was "required that when we submit the information pertaining to any individual tax crime, even if it doesn't pertain to his own taxes, we always have to get a transcript of their filing record." Thus, Mr. Trezza ascertained that Mr. Tenzer had been a late filer for the years included in this prosecution, but that his returns had been filed, and desultory efforts to collect the taxes due had begun.

■ In June 1993, Mr. Trezza spoke to the Civil Collection Officer. Finding from that discussion that there was a file showing collection efforts, he asked for that file. The civil file was requested from the Collections Office on June 14, 1993 by Special Agent Gross. Special Agent Gross notified the collections officer not to take any action on the account until a decision was made to put a "914" freeze [2] on the account. On June 23, Gross notified the collections officer that steps were being taken to put such a freeze on the collection efforts. Collection remains frozen to this day.

On June 24, 1993, the office of the United States Attorney requested from IRS District Counsel authorization to expand the Title 26 Grand Jury investigation of JRD to include James Tenzer as a named subject in his role in the preparation of JRD's tax returns. By

---

**2.** A "914" freeze is a code, based upon an obsolete form, reflected on the taxpayer's transcript, that signifies that the taxpayer is under criminal investigation. When a 914 is issued on a particular taxpayer's case, all civil collection and assessment efforts stop. (Transcript 526–529.)

letter dated July 8, 1993 the United States Attorney received authorization to investigate Tenzer for Title 26 offenses, without limit. The following day, July 9, 1993, Special Agents Trezza and Gross notified Myron Weinberg that Tenzer was now a subject of a Grand Jury investigation into his personal tax matters.

On September 28, 1994, Special Agents Trezza and Gross attended a pre-referral conference with James Biaggi, an attorney with the IRS' District Counsel's Office. As a result of that meeting, by a memorandum authored by Robert B. Marino, Assistant District Counsel, the IRS concluded that it would be appropriate for the United States Attorney's Office to proceed with a prosecution for failure to timely file tax returns as Tenzer did not meet the criteria for the Voluntary Disclosure Policy.

As will be understood, this was unusual. Most prosecutions for failure to file originate with the IRS and are sent to the Department of Justice which may decline. In this case the request to proceed against Tenzer as a non-filer originated with the DOJ, or more correctly, the local United States Attorney's Office, after it had exhausted its ability to make a case against Tenzer for his likely complicity in the JRD tax fraud. An understandable desire to make some charge of some sort stick against Tenzer appears to have influenced subsequent consideration of his case in light of the Voluntary Disclosure Policy.

The Special Agent's Report dated November 15, 1994, recommending that charges be brought for failure to timely file, was forwarded by the IRS to the Department of Justice. Thereafter, Tenzer's counsel attended a meeting at the DOJ where they argued that Tenzer should not be prosecuted because he fell within the provision of the IRS' Voluntary Disclosure Policy. Rejecting this contention, the DOJ subsequently authorized this prosecution of Tenzer for failure to

timely file tax returns for the years 1987–1990, as four separate counts.

## THE VOLUNTARY DISCLOSURE PROGRAM

Since about 1961, the IRS has had a publicly announced Policy, changed from time to time, which is to encourage taxpayers who have failed to file returns, to do so and in effect come, or be brought back into the system for past and future returns. There are many such non-filers, some of whom are entitled to refunds, and some of whom fail to file for a variety of reasons which do not include the intent to evade income taxes. The goal of the agency is not to procure misdemeanor convictions against these non-filers as a general deterrent to others, as authorized by Congress, but rather, to collect their taxes and welcome them back to the largest voluntary tax assessment system in the world.

To lure these non-filers into a state of grace with their taxes, offers and promises were made from time to time with much public fanfare, couched, unfortunately, in language not always precise as a penal statute, and written without much consideration of possible application of the rule of the *Caceres* footnote.

While the applicability and scope of the Voluntary Disclosure Policy are a matter of law for this Court to determine, there is some dispute as to what the actual publicly stated Policy of the IRS was at the relevant times in this case, and how it was imparted to the public.[3] In this regard, the testimony of Assistant District Counsel Robert Marino and former Acting Assistant Attorney General James Bruton during the evidentiary hearing is relevant.

■ Mr. Robert Marino testified that the Voluntary Disclosure Policy (the "Policy") governs how the IRS reviews its cases when considering a referral for prosecution, and that it is not intended to create any substantive rights.[4] Marino testified that it was the

---

**3.** There is no evidence that Tenzer ever heard of the Policy at the time he acted. Reliance, however, is not an element of the defense here, which implicates the equal protection element implied in the Due Process Clause of the Fifth Amendment.

**4.** In light of the *Caceres* case this intent is irrelevant.

IRS' view that Tenzer did not make a true voluntary disclosure, and that even if he had, prosecution was warranted due to his egregious circumstances. (Transcript, 170.) We note that there is no exception stated in the Policy for egregious circumstances, whatever that means. Marino testified that the voluntary disclosure did not apply to Tenzer because (1) it was "triggered" by Mr. Trezza's service of the JRD subpoena on Mr. Tenzer; (2) that he did not believe that the Offer and Compromise was legitimate; and (3) that "[t]he amount of money involved; the amount of years involved; no withholding paid; taxpayers sophistication; being an attorney: All of these matters, I think, make this an egregious case." (Transcript, 171.) This Court agrees that the misconduct of Tenzer is egregious by any definition of the word; that is besides the point under the IRS Policy.

The Internal Revenue Manual ("I.R.M.") at Section 342.142 (promulgated April 5, 1993) set forth the Service's Voluntary Disclosure Policy as effective when this prosecution commenced. Subsection (3) lays out the conditions under which a non-filer may qualify for relief under the Voluntary Disclosure Policy. The person must have:

1) informed the Service that he or she has not filed returns for one or more taxable years;

2) had only legal-source income;

3) made the disclosure *prior to being contacted by the Service notifying the taxpayer* or his/her representative by letter, the phone or personal visit *that the taxpayer is under criminal investigation;*

4) either filed true and correct tax returns or cooperated with the Service in ascertaining his/her correct tax liability; and

5) either made full payment of the amounts due or in those situations where the taxpayer was unable to make full payment, made a bona fide arrangement to pay.

(Emphasis added)

Subsection (5) provides that the IRS' voluntary disclosure practice creates no substantive or procedural rights for taxpayers, but rather is a matter of internal IRS practice, provided solely for guidance to IRS personnel. The validity of this reservation is challenged in light of *Caceres,* discussed below.

■ The Government's position is that the proper Voluntary Disclosure Policy to apply is not that which was in force when the decision was made to prosecute, in clear derogation of the express terms of the Policy, but rather that Policy which was in effect in February of 1992, when Tenzer's tax returns were filed. This Court rejects this argument. The Policy in effect when the decision to prosecute is made is the Policy which under *Caceres* must control the decision making.

The critical distinction between the Policy when the returns were filed, and the Policy as effective at the initiation of this prosecution is the definition of when a Voluntary Disclosure is timely made. Section 342.14, as effective when the defendant was initially contacted by the IRS regarding his non-filing status, required the disclosure to be made prior to the taxpayer's awareness of an IRS inquiry.[5] Unlike the April 5, 1993 "Policy", the provision did not limit itself to "criminal" inquiries. Specifically, the Voluntary Disclosure Policy as effective in February, 1992, considered a disclosure to be timely when it is received before:

(a) The IRS has initiated an inquiry that is likely to lead to the taxpayer, and the taxpayer is reasonably thought to be aware of that investigative activity; or

(b) some event known to the taxpayer occurred, which event is likely to cause an audit into the taxpayer's liabilities, e.g., a newspaper article highlighting commercial bribery in a particular industry or corruption in a government office.

The Policy as in effect during 1993 was first announced in an IRS press release issued in December of 1992 by then IRS Com-

---

**5.** A computer generated inquiry is probably not an inquiry for these purposes. However, as noted, the pre–1993 Policy should not apply to the case. As discussed *infra* in text, Tenzer's case is also within the prior Policy.

missioner Shirley Peterson. In April of 1993, the IRS Manual was updated to conform to the Policy announced in the press release. During the evidentiary hearing, Robert Marino attempted to minimize the importance of this change by suggesting that the December 1992 press release did not accurately reflect Ms. Peterson's intent, and that what she really meant was only that out of 147 million returns that are filed in a year only 2,500 are actually prosecuted. "[W]hat [Peterson is] really saying, as a practical matter, is that most people who don't file returns probably don't get prosecuted, and I think that's what she was saying there." (Transcript, 134.) While it is not uncommon for press releases to reflect inaccurately the drafter's intent, any notion that the press release quoted *infra*, was inaccurate is belied by the fact that in April of 1993 the IRS Manual was updated to reflect the change.

■ In 1995 the IRS switched back to the Policy in effect prior to April 5, 1993 and amended its Manual provisions accordingly.[6]

■ The Government argues that the service upon Mr. Tenzer of the subpoena directed at JRD documents was enough to put him on inquiry of investigative activity into his own return and make any subsequent disclosures untimely. However, under either standard, pre or post 1993, this Court concludes that the Voluntary Disclosure Policy standards were met by Mr. Tenzer. Under the "Peterson" Policy, Tenzer filed prior to being notified of a pending "criminal" investigation into his personal taxes. And un-

der the prior and now current Policy, Tenzer began good faith efforts through Attorney Weinberg to file his returns and become current on his obligations prior to a sufficient "triggering" to alert him that he was under investigation.

An October 5, 1994 memorandum to Peter Persampieri, Manager of CID [7] Group C–21, from District Counsel Manhattan signed by Robert B. Marino, Assistant District Counsel which was examined by this Court as *in camera* exhibit [8], summarized the tax filing history of Mr. Tenzer noting that he had filed his 1987, 1988 and 1989 tax returns delinquently on February 10, 1992 and his 1990 return was filed on November 13, 1992. "Tenzer has a long history of delinquent filing. Since 1976 he has filed only one timely return." The report notices that on November 13, 1992, when Tenzer filed his 1990 return upon the request of a revenue officer "he was aware that he was a potential target of the JRD investigation." This report continues:

The Internal Revenue Manual at Section 342.142 (promulgated April 5, 1993) sets forth the Service's voluntary disclosure Policy regarding a tax payer who come [sic] forward to report his/her tax crime. According to Sub-section (2), a voluntary disclosure occurs when a taxpayer's communication is truthful, timely, complete, and he/she shows a willingness to cooperate. Subsection (3) lays out the condition under which a non-filer may qualify for relief under the voluntary disclosure Policy.

---

**6.** It is interesting but probably irrelevant that the Tax Division of the Department of Justice, which claims to have the final determination of whether to prosecute a Grand Jury matter, has published policies on voluntary disclosures that mirror the IRS' Policy prior to the December 1992 revision. When the IRS modified it's Policy in 1992 the Tax Division did not change its policy to reflect that new IRS definition of a timely disclosure. (Transcript, 161.) However, James Bruton, who in his former role as Deputy Assistant Attorney General was responsible for overseeing all criminal tax cases in the United States, testified, and I find, that the IRS is the interpreting agency and the Department of Justice as a matter of Policy simply abides by the IRS' determination. (Transcript, 275.) So, as a practical matter, the Department of Justice, while having final determination as to whether any matter will

be prosecuted or not, will not seek prosecution in a tax matter without IRS concurrence that it should do so.

**7.** Criminal Investigative Division of the Internal Revenue Service. Special Agents Trezza and Gross were employed with the CID, while Revenue Officer Kishlansky was in the Civil Division.

**8.** It is doubtful whether the findings in the Memorandum are privileged at this point of time. To rule on privilege the Court must examine the document, following which it is difficult to unring the bell. Even if the reasoning is privileged, or the document itself cannot be considered, this is academic as the facts themselves can be inferred from the testimony and other evidence in the case.

The memorandum then listed the five elements required to be satisfied and concluded that elements 1, 2 and 4 were in fact satisfied by Mr. Tenzer in that he had informed the service he had not filed for one or more years, had only legal-source income and filed correct tax returns. Accordingly, Mr. Marino concluded that the only issues to be addressed were whether Mr. Tenzer had met elements 3 and 5. The attorney concluded in his authoritative interpretation of IRS Policy that the 1990 return was not within the Voluntary Disclosure Policy because the taxpayer had been "contacted by CID prior to filing."

As noted earlier, this conclusion is not supported by the facts. There was nothing in the service of the subpoena for JRD papers which would reasonably be regarded as a triggering event or contact by CID which notified Tenzer he was under criminal investigation for failure to file his own returns. Such contact was at most notice with regard to criminality in connection with his activities as accountant for JRD and its affiliates.

Recognizing that Mr. Tenzer, "may meet the literal meaning of the third element" counsel rendered the opinion that "treating Tenzer's filing as a timely disclosure" would pervert application of the Service's Voluntary Disclosure Policy. Counsel concluded that in light of Tenzer's involvement with JRD, his expertise in taxation and the fact that he may have assisted in JRD's tax evasion scheme:

> [I]t is reasonable to conclude that Tenzer's notification of the JRD investigation was adequate to alert him that he was a potential target of a criminal investigation thereby prompting his delinquent filings. As such it is this Office's opinion that Tenzer did not make timely disclosure.

Counsel also took the position with respect to the amendment of Section 342.142 that the prior provision should be applied to determine whether Tenzer made a timely disclosure. Under the previous version, counsel argued, disclosure was timely if it was received before the Service had initiated an inquiry that was likely to lead to the taxpayer and the taxpayer was reasonably thought to be aware of the investigative activity, or some event known by the taxpayer occurred which was likely to cause an audit into the taxpayer's liabilities. However, as noted above, this limitation was not applicable after December 1992 when the voluntary disclosure program was loosened so as to permit a taxpayer to qualify if he/she made disclosure prior to CID contact. The Assistant District Counsel also concluded that the application of the Voluntary Disclosure Policy was unwarranted because of Tenzer's refusal to pay the tax that was due and because there were no bona fide arrangements to pay. The opinion remarked upon Tenzer's "extravagant lifestyle, spending substantially all of his large income on expensive cars and homes."

The Policy then in effect does not allow for these conclusions to affect its administration. Insofar as concerns the inadequacy or claimed bad faith in the offer to Compromise (1.3 Million in taxes for $250,000,) this Court concludes that the filing of the Offer (the work of experienced IRS alumnus Honecker and two other tax specialists) laughable as it may be, was not sufficient to disqualify Tenzer form the benefits of Voluntary Disclosure. Tenzer acted on the advice of experienced counsel, intending fully to comply with and get the benefit of the Policy. The attorneys were following their customary practice, in effect opening negotiations with a low-ball offer. The Service could have and did reject the Offer, and was free to have assessed, liened, restrained, and otherwise collected the tax from Tenzer at any time.

Having concluded that Tenzer met the requirements of the IRS' Voluntary Disclosure Policy, this Court must now determine the consequences of the IRS' failure to follow its own Policy.

The doctrine expressed in footnote 14 of *Caceres* has its origins well prior to that case. As our Court of Appeals explained in *Montilla v. I.N.S.*, 926 F.2d 162, 166 (2nd Cir.1991), the seeds of the doctrine "are found in the long settled principal that rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency." Citing *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 422, 62 S.Ct. 1194, 1202–03, 86 L.Ed. 1563 (1942) (agency regulations on which individuals are entitled to rely bind

agency.) In *Smith v. Resor*, 406 F.2d 141, 145 (2nd Cir.1969), our Court of Appeals recognized that "[a]lthough the courts have declined to review the merits of decisions made within the area of discretion delegated to administrative agencies they have insisted that where the agencies have laid down their own procedures and regulations, those procedures and regulations cannot be ignored by the agencies themselves even where discretionary decisions are involved." In *Montilla v. I.N.S.*, our Court of Appeals concluded that the rule requiring an agency to abide by its own policies and regulations as being "premised on fundamental notions of fair play underlying the concept of due process," and that "[i]ts ambit is not limited to rules attaining the status of formal regulations." 926 F.2d at 167.

■ The Government argues that the IRS' Voluntary Disclosure Policy governs only "internal agency procedures" and thus affords Mr. Tenzer no Due Process rights. As the evidentiary hearing made clear however, the Voluntary Disclosure Policy was disseminated to the public through grandiloquent press releases, and materials made available at IRS offices which tend to omit the fine print. For example, Defendant's Exhibit D is IRS publication 1715 (Rev. 7–93) entitled "It's Never Too Late!" The brochure explains the benefits of the Voluntary Disclosure Policy. Under the subheading "Will I go to jail?" it provides:

> *Our long-standing practice has been not to recommend criminal prosecution of individuals for failure to file tax returns— provided they voluntarily file, or make arrangements to file before being notified that they are under criminal investigation.* (Emphasis added)

> \* \* \* \* \* \*

> ... We want to get people back into the system, not prosecute ordinary people who made a mistake. However, we will continue to investigate flagrant cases involving criminal violations of the tax laws.

Under the totality of the circumstances, any reservation by which the Government may nevertheless prosecute individuals regardless of compliance with the Policy must be ineffective if the *Caceres* doctrine is to be given any weight. Indeed it is fair to say that Tenzer's case is unique in the regular day to day administration of the Policy.

■ The Government argues that even were the Voluntary Disclosure Policy applicable to Mr. Tenzer, as this Court concludes that it is, the Information should not be dismissed because Tenzer has failed to demonstrate that he relied on the Policy or suffered any prejudice because of the IRS' noncompliance with the Policy. There can be little doubt however that Tenzer's experienced counsel were familiar with the Policy and were advising him in light thereof. Tenzer's counsel informed Revenue Officer Kishlansky that it was Tenzer's intent to make such a Voluntary Disclosure, and she informed them that the case was being handled as a civil and not a criminal matter. The same notions of fairness which require an agency to abide by its own regulations require that Tenzer, who met the requirements of the Policy, be afforded its benefits even were he not relying on it. Insofar as concerns prejudice, we doubt this needs to be proved to rely on the *Caceres* doctrine. If Tenzer is being prosecuted because of a failure to apply the Policy because of mistake of fact or law, he is prejudiced. If, as appears highly likely, the Policy would have been applied to him but for the justifiable conclusion on the part of the authorities that he lived an extravagant lifestyle and probably aided and abetted JRD in criminality, the case represents a denial of Constitutionally protected due process.

■ An issue that arose during the evidentiary hearing was whether Count Four of the Information against Mr. Tenzer should also be dismissed because his prosecution violates the Non–Solicitation Policy of the IRS. Section (31)3600 of the Internal Revenue Manual entitled "Solicitation of Returns" provides that prosecution should not be recommended when a return is solicited and received prior to the taxpayer being contacted by the Criminal Investigation Division. Because the Non–Solicitation Policy expressly excludes "Computer generated inquiries" from solicitations, and because the returns for the years 1987, 1988 and 1989 were filed

in response to computer generated notices the solicitation policy would not seem to apply to those years. However, the 1990 return, which was personally demanded by the Revenue Officer, would seem to fit squarely within the Non–Solicitation Policy and should not have been prosecuted. This presents an additional ground to bar prosecution under Count Four of the Information.

 The Government argues that the Non–Solicitation Policy is not applicable because (1) the returns were only demanded so that Tenzer's Offer in Compromise could be processed, and (2) Tenzer did not rely upon the Policy. Both arguments are without merit. The Government argues that in essence the 1990 return was not solicited because it would not have been demanded by the Revenue Officer had it not been for Tenzer's desire to file an Offer in Compromise. The rights protected by the Non–Solicitation Policy however are not concerned with *why* a return was solicited, but only that it was solicited. The Non–Solicitation Policy is premised upon the concerns protected by the Fifth Amendment protections against self incrimination. The concerns protected by the Non–Solicitation Policy involve situations where an individual has not filed a return, the IRS subsequently demands the return, the return is filed by the individual, and then the IRS turns around and prosecutes the individual based upon the information supplied in the return. Such a situation is no less egregious when the taxpayer is unaware of the Non–Solicitation Policy and does not rely upon it in filing the return.

As a final matter, Mr. Tenzer moves to dismiss Count One of the Information as it relates to 1987 on the basis that prosecution for that year is time barred. The uncontested evidence indicates the following: Tenzer's 1987 tax return was originally due on April 15, 1988. He sought and received two extensions for filing, extending his filing date through October 17, 1988. Accordingly, absent a tolling agreement, the statute of limitations for the 1987 tax return would have run on October 17, 1994, six years from his extended date of filing. Tenzer however entered into a series of tolling agreements with the Government and agreed to toll the limitations periods for all charges that could have been brought on August 31, 1994, until and including November 30, 1995, the date on which the Information was filed. Title 26 of the United States Code at Section 6513(a) provides a uniform expiration date by providing that returns filed before the deadline date are to be considered as having been filed on the deadline date. In *United States v. Habig,* 390 U.S. 222, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968), the United States Supreme Court concluded that the provision is limited to cases in which the return is filed or payment is made prior to the statutory deadline. As such, the provision is inapplicable to this case and Count One was timely brought.

Accordingly, the defendant's motion is granted and the Information is dismissed as to all Counts on the ground that defendant complied with and is protected by the Internal Revenue Service's Voluntary Disclosure Policy. Count Four relating to the tax year 1990 must also be dismissed for the independent reason that the return was actively solicited in violation of the IRS' published Non–Solicitation Policy.

SO ORDERED.